THEODORE BOSTROEM and KYRA T. BOSTROEM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bostroem v. Commissioner
Docket No. 361-71
United States Tax Court
T.C. Memo 1974-156; 1974 Tax Ct. Memo LEXIS 165; 33 T.C.M. (CCH) 676; T.C.M. (RIA) 74156; June 17, 1974, Filed. *165 In consideration for filing and financing patent applications covering a process for galvanizing steel in certain countries, petitioner received an equal interest with the inventor in the patents thereafter issued by those countries. Three years later, petitioner exchanged his interest in the patents for a 10 percent royalty in the net proceeds from the galvanizing process and another process covered by numerous worldwide patents. Held: Petitioner is entitled to characterize the proceeds received pursuant to the royalty agreement as capital gain received from the sale of patents or undivided interests therein under the provisions of section 1235(a). Isadore Cassuto and Arnold Y. Kapiloff, for the petitioners. Marion L. Westen and L. William *166 Fishman, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: The Commissioner determined deficiencies in the petitioners' federal income tax as follows: Year
Deficiency 1965
34,537.00
1966
33,861.06
1967
29,838.25
The sole issue for decision is whether certain payments totalling $106,459.88, $117,578.50 and $85,754.21 received by the petitioners in the calendar years 1965, 1966 and 1967, respectively, are taxable as long-term capital gain realized from the sale or exchange of all substantial rights to patents or undivided interests therein. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with attached exhibits, are incorporated herein by this reference. Petitioners Theodore Bostroem and Kyra T. Bostroem, husband and wife, resided at the time of the filing of their petition herein at Middlebury, Connecticut. For the calendar years, 1965, 1966, and 1967 petitioners filed timely joint federal income tax returns, using the cash basis method of accounting, with the district director of internal revenue at Hartford, Connecticut. We will hereinafter *167 refer to Theodore Bostroem as "petitioner". Petitioner is an engineer, having had considerable study in both mechanical and electrical engineering. He obtained an advanced engineering degree in Paris. While working in Paris, France in 1929 or 1930, petitioner met Tadeus Sendzimir (hereinafter "Sendzimir"). Sendzimir had developed a new galvanizing process, whereby metal is coated with hot zinc to prevent oxidation or rusting. Sendzimir had applied for a patent on this process in the United States, but had been unsuccessful during the early years in promoting its use. Sendzimir, at some time prior to April 27, 1931, visited with the petitioner in Paris and discussed the future of the galvanizing process. Sendzimir was en route to Poland, where he had contacted a firm which was interested in the new process. At that time Sendzimir and the petitioner verbally agreed that the petitioner would finance patent applications in certain European countries, and in exchange would receive equal rights in any patents that were issued. Sendzimir and the petitioner never reduced their agreement to writing. Petitioner borrowed the necessary funds from family and friends and paid all *168 expenses incident to the filing of patent applications covering the galvanizing process in England, Belgium, France, and Germany. During 1931 the following patent applications in respect of Sendzimir's galvanizing process were filed and issued thereafter: British Patent #385,971, filed April 27, 1931 in the name of both Sendzimir and petitioner; Belgium Patent #378614, application filed April 30, 1931, issued in the name of Sendzimir and petitioner, and French Patent #716.144, application filed March 31, 1931, issued in the name of Sendzimir alone. Petitioner filed a patent application in Germany and it was not established whether the application was issued in joint names or Sendzimir's alone. During this period, petitioner was a full-time employee of Dyle et Bacalan Co., Paris, France, and engaged in various engineering jobs. Shortly after the above patent applications were filed, Sendzimir executed the following Power of Attorney: Power of Attorney. I, undersigned, Thaddeus Kazimir SENDZIMIR, Engineer, of Poland, Lwow, Teresy 12, - and formerly of China, Shanghai, 24 Yenmingyuen Road authorize Mr. Theodore Jean Bostroem, Engineer, of France, Meudon, S. et O, 38, Av. de la Gare, *169 to conduct negotiations regarding sale of world rights (with exception of USA, Canada, and Poland) of the patents on "IMPROVED METHOD OF HOT GALVANIZING" on which the first patent application was filed in Washington, D.C., under the No. 448 208, on conditions to be determined on the spot and in presence of the persons interested. I also confirm equal participation in the world rights except in the mentioned countries. In Warsaw, April 30, 1931. (Signed): T. Sendzimir. At this time the new galvanizing process was untested, experimental, and not operational. Neither the process itself nor the patents issued in respect thereof had been commercially exploited.In attempting to locate potential licensees of the galvanizing process, both petitioner and Sendzimir realized that sufficient raw material (sheets of commercial gauge steel) were not available to exploit successfully the galvanizing process. Sendzimir located persons in Poland who were engaged in the galvanizing business and were interested in investing in the new process for their own business. As a result a small pilot furnace was built in Poland which proved to be successful. However, they still had not solved *170 the problem of obtaining sufficient raw material to make the process commercially successful. In the latter part of 1932, Sendzimir developed a cold rolling mill process for the rolling of steel which produced metal of the size and thickness sufficient to enhance the commercial salability of the galvanizing process. Sendzimir filed patent applications for the cold rolling mill process and patents were issued in respect thereof, solely in his name. Petitioner had no interest in the cold rolling mill process at that time. With continued financial support Sendzimir proceeded to build a pilot cold rolling mill which could produce metal that was suitable for the earlier developed galvanizing process. In March 1933, at Sendzimir's request, petitioner went to Poland to assist in building the pilot cold rolling mill. While working at the mill, petitioner was provided food and lodging and also received small advances. Petitioner realized that, if the cold rolling mill was successful, his interests in the galvanizing patents would be greatly enhanced. Sendzimir and his financial backers soon formed a new company which was to own the pilot cold rolling mill. Petitioner did not have *171 an interest in this company. Petitioner however did become an employee of the company and received as compensation a reasonable salary plus premium. The cold rolling mill was completed in the beginning of 1934 and was sold by Sendzimir's company to Huta Pokoj, Poland's then largest steel works. The patents issued in England, Belgium, France and Germany became extremely valuable. Prior to completion of the cold rolling mill in Poland, Sendzimir and petitioner agreed that the petitioner would finance no further patent applications. Further they agreed that the petitioner would transfer his interests in the English, Belgian, French and German galvanizing patents to Sendzimir in exchange for a 10 percent royalty interest in the net proceeds received by Sendzimir from the exploitation of both the galvanizing patents and the cold rolling mill patents, together with any improvements thereon, in the entire Eastern Hemisphere except Poland and the free city of Danzig. Sendzimir became sole owner of all patents connected with both the galvanizing and cold rolling mill processes. Petitioner no longer had the right to negotiate the sale of any rights in the patents. The entire agreement *172 was verbal and no formal documents of transfer were executed. Shortly thereafter, Sendzimir entered into a licensing agreement with Metallurgical Products, Limited (Metpro), an affiliate of Armco International Corporation, covering both the galvanizing and cold rolling mill processes. Sendzimir represented to Metpro that he was sole owner of all patents relating to these processes. By letter dated September 16, 1935, Metpro advised petitioner that Sendzimir had informed it that "he has a verbal agreement with you and, in the total discharge thereof, he has instructed us to pay to you ten per cent (10%) of his share or interest in any such moneys that may be payable to him." The only limitations on payments noted in the letter were in the event that Sendzimir's patents infringed upon others and to the extent required to comply with tax laws. After the cold rolling mill was purchased by the Huta Pokoj Steel Works, petitioner was employed by Huta Pokoj in the capacity of engineer and received compensation slightly in excess of his compensation received from Sendzimir. By the end of 1934, Sendzimir had signed an employment agreement with Armco International Corporation (hereinafter *173 "Armco"), an Ohio based corporation, to establish a cold rolling mill and galvanizing mill in Paris, France, for Armco, S.A., a French affiliate. During 1935 Sendzimir asked the petitioner to work with him in Paris. Armco, S.A., hired petitioner in the middle of 1935 at an initial salary of 3000 francs per month. In 1939 Sendzimir was asked by Armco to serve as consultant in the United States during the construction of a cold rolling mill. Sendzimir did not know how long he would be away, and wanted petitioner to remain in charge of the Paris office until he returned. Sendzimir was also concerned about petitioner's loyalty. On May 16, 1939, prior to departure for the United States, Sendzimir wrote petitioner the following letter: Paris, 16th May 1939 Dear Sir, I hasten, in the little time left before my departure to the USA (tomorrow), to give you satisfaction and to confirm to you in writing the verbal agreement taken place between us in 1934 with regards to your participation in the profits of the exploitation of two of my patented processes, as below. I bear in mind that this question is rather complex and that certain points of it still have to be discussed between *174 us so as to arrive at final texts of our agreement. I consider, and I would ask you to express your accord to it by counter-signing the enclosed copy of the present letter, that as soon as I return from the USA, in about six weeks, the present agreement can be nullified by simple request of either of the parties, i.e., you or me, and that at that time we will re-discuss this business so as to come to a final text thereof. On conditions of this agreement and to remunerate your collaboration from the beginning in the starting up and the exploitation of my inventions relating to the processes of coating of metals and of cold rolling and namely: 1. Process for metal coating in which the metal to be coated is first submitted to a heat treatment in special atmospheric conditions and immediately thereafter is dipped into one or more baths of coating metal in a molten condition; 2. Process of cold rolling of steel and iron consisting in the use of a stiff housing in one piece in which are located relatively small rolls backed by appropriate supporting means, rolls between which the metal to be worked is introduced and simultaneously drawn in special conditions, the metal being rolled *175 in a closed loop; and in particular, in compensation for: - the filing of four patent applications in 1931 in England, Germany, France, and Belgium, regarding a galvanizing process, - at your cost, - - the suggestion of yours of a solution of traction regulation and speed control in my cold rolling mill by the introduction of a planetary gear system, - the most efficient collaboration of yours during 1933 & 1934 in quality of engineer of the Societe Walcownia Sendzimir for the starting of my first mill in HUTA POKOJ Works in Poland, - as well as to insure to me your sincere and entire collaboration in the future, - I have conceded to you as of this date a participation of 10% of all sums of money which will become due to me, after deduction of expenses, as a result of exploitation of these inventions in the countries of the eastern hemisphere with the exception of Poland and the Free City of Danzig. I confirm more precisely that the rights thus acquired by you concern all agreements that I have concluded and all those to be concluded by me in future concerning the exploitation of said inventions in said countries. These rights will remain yours and will stay yours *176 and your right-successor's in any place and circumstances whatsoever except in the case where you would act in competition with my processes and equipments like, for instance, if personally, or through the intermedience of third parties you would participate in the realization of my processes in competition with me or with my licensees. * * * I confirm, simultaneously, that the present letter constitutes the only agreement existing between us. "Best regards" etc. [French expression] Signed: T. Sendzimir. Sendzimir did not return to Paris until 1946. The reference in the letter above to petitioner's suggestion of "a solution of traction regulation and speed control in my [Sendzimir's] cold rolling mill by the introduction of a planetary gear system" related to a suggestion made by the petitioner after the cold rolling mill had been completed. In February, 1948 petitioner left the employ of Armco, S.A., and came to the United States. Although petitioner did not have a job when he arrived in the United States, he later got a job with Armsen Company which was owned jointly by Armco and Sendzimir. Since then petitioner has worked for Sendzimir or affiliated companies, *177 either on a full or part-time basis. At all times petitioner received a reasonable salary for a man in his capacity. Pursuant to his agreement with Sendzimir, petitioner received royalties from Sendzimir or Armco, a licensee, in the amounts of $106,459.88, $117,578.50, and $85,754.21 for the calendar years 1965, 1966 and 1967, respectively, which petitioner reported as long-term capital gain.
OPINION The sole issue for our determination is whether certain payments totalling $106,459.88, $117,578.50, and $85,754.21 received by the petitioners for the calendar years 1965, 1966 and 1967, respectively, are taxable as long-term capital gain realized from the sale or exchange of all substantial rights to patents or undivided interests therein. Whether the payments in issue were received in exchange for petitioner's interests in certain patents is a question of fact. See Thomas H. McClain, 40 T.C. 841 (1963); Sec. 1.1235-1(c) (2), Income Tax Regs. Moreover because the agreements in issue are verbal, credibility has played a crucial role in our determination. We will not repeat our findings of fact which we feel are dispositive of the issue before us, except as is *178 necessary to emphasize our decision. Respondent's position is that petitioner never owned any patent rights in the galvanizing process, and further that any royalty rights he was given were in exchange for services and a covenant not to compete. If such were the case, it is clear that any amounts received would constitute ordinary income. Henry P. Wager, 52 T.C. 416 (1969). We are of the opinion that petitioner's interests in the galvanizing patents issued in England, Belgium, France and Germany were tantamount to equal ownership with Sendzimir. Sendzimir, at the trial herein, admitted petitioner had an "equal participation" in the patents. On at least two of the patents, petitioner was listed as co-owner. Moreover, petitioner had the right to negotiate the sale or licensing of the patents. As such we believe petitioner had more than a royalty interest in the four patents. See Waterman v. Mackenzie, 138 U.S. 252 (1891); Flanders v. United States, 172 F. Supp. 935 (N.D. Cal. 1959). While we recognize that a power of attorney, such as that given to petitioner by Sendzimir, is normally associated with an agency relationship, we are of the *179 opinion that the instrument herein was executed to avoid difficulties stemming from varying legal title in the patents. Section 1235(a) provides capital gain treatment on the sale or exchange of a patent by a "holder" regardless of whether the payments are "contingent on the productivity, use, or disposition of the property transferred". Section 1235 in pertinent part states the following: Section 1235. Sale or Exchange of Patents. (a) General. - A transfer * * * of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are - (1) payable periodically over a period generally coterminous with the transferee's use of the patent, or * * * (b) "Holder" Defined. - For purposes of this section, the term "holder" means - * * * (2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention *180 covered by the patent, if such individual is neither - (A) the employer of such creator, nor (B) related to such creator * * *. It is our view that petitioner qualifies as a "holder" within the purview of the above quoted provision of the Code since he was not an employee or related to the creator of the patented galvanizing process, and he acquired his interest in the process for a consideration capable of valuation in monetary terms paid to the creator prior to the process's actual reduction to practice. See also Section 1.1235-2(d) (1) (ii) and (e), Income Tax Regs.; Elmo Meiners, 42 T.C. 653 (1964). In 1934 petitioner exchanged his interests in the four galvanizing patents for a 10 percent interest in both the galvanizing and cold rolling mill patents. Only at that time did Sendzimir represent himself as sole owner of all the patents related to these two processes. While it is true that petitioner may have performed substantial services for Sendzimir, the record clearly indicates that petitioner was also given compensation commensurate with his duties, and his royalties therefore must be deemed above and beyond his salary. Sendzimir did grant certain other *181 individual's royalty interests similar to petitioner's, but the record is not sufficiently clear for us to determine why the other royalty interests were granted. Lastly Sendzimir's letter written to the petitioner five years after their agreement appears to have been motivated more by fears that petitioner might work for a competitor of Sendzimir's than an accurate reflection of the agreement between the two men. Indeed Metpro, which remitted certain royalties directly to petitioner, indicated in a letter that the 10 percent royalty was to be paid without regard to where petitioner worked. As such respondent's contention that the royalty was in part for a covenant not to compete seems unfounded. Lastly respondent has argued that assignments of patents were never effectuated. However this case, as we previously mentioned, has had few agreements reduced to writing. Nevertheless, we have been guided by what we perceive the intent of the parties to have been. Therefore legal formalities, while considered, were not controlling, especially in light of the long history of mutual understanding, without formal documents, between Sendzimir and petitioner. Rose Marie Reid, 26 T.C. 622 (1956). *182 While a rather close case, we hold that petitioner did sell his undivided interest in the four patents, and is consequently entitled to report such royalty income therefrom as capital gain under the provisions of section 1235. Decision will be entered for the Petitioner.