ELMO MEINERS AND LAVERNE MEINERS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 95216. Filed June 26, 1964.

*Donald H. Sanborn* and *Fred W. Wollrab*, for the petitioners.
*Nelson E. Shafer*, for the respondent.

DAWSON, *Judge:* Respondent determined deficiencies in the income tax of petitioners for the years 1958 and 1959 in the amounts of $1,776.01 and $1,625.03, respectively. The primary issue for decision is whether certain amounts received by petitioners during the taxable years 1958 and 1959 from the M & W Gear Co., Inc., qualify for capital gains treatment under the provisions of section 1235, Internal Revenue Code of 1954.[1] An ancillary question, posed by respondent's amended answer herein is whether, if such amounts do qualify under section 1235, capital gains treatment is nonetheless barred by reason of section 1239.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties. Their stipulation, together with attached exhibits, is incorporated herein by this reference.

Elmo and LaVerne Meiners are husband and wife residing in Anchor, Ill. Their joint income tax returns for the years 1958 and 1959, made on the cash basis and for the calendar year period, were filed with the district director of internal revenue, Springfield, Ill.

During the years material to this proceeding, Elmo Meiners (hereinafter referred to as petitioner) was the sole proprietor of a grain business located at Anchor, Ill. Sometime in 1947 petitioner and Arthur J. Warsaw, an International Harvester implement dealer, became interested in developing certain mechanical improvements primarily for use with the International Harvester farm tractor. At the time, the

---

[1] All Code references herein are to the Internal Revenue Code of 1954 unless otherwise noted.

International Harvester (I–H) tractor was at a competitive disadvantage with other makes of farm tractors because of two things, namely, the I–H tractor had a top speed in the field of only 5 miles per hour making it too slow for rotary hoe cultivation and it had no live clutch, a device which is deemed desirable for controlling the speed of tractor accessory implements operating from the tractor power takeoff gear (such as a thresher, cornpicker, or combine) independent of the groundspeed of the tractor itself.

Petitioner and Warsaw agreed that both of these defects could be cured by the combined development of a new transmission and clutch arrangement which would be designed to fit the existing I–H tractor or its equivalent with a minimum of modification. As contemplated by the two men, a new transmission would provide, through its power takeoff, variable speeds for tractor accessories although the transmission input from the tractor engine remained constant, while a new clutch disposed between the transmission and the driving wheels would permit the stopping or slowing of the vehicle without affecting the normal connection between the transmission power takeoff operating the accessories and the motor input to the transmission.

Acting on an initial suggestion by petitioner relative to the transmission, Warsaw, sometime in 1947, undertook its design. Concurrently, Warsaw also began work on the design for a suitable cone-type clutch to complement the transmission. During the initial design stage petitioner and Warsaw conferred in th evenings after work, at which time petitioner reviewed the progress made and offered suggestions as to the inchoate designs. To facilitate the work, Warsaw, sometime in 1948, moved into petitioner's home where he remained as a nonpaying guest for approximately the next 2 years.

Sometime prior to November 1948, the first designs for a new tractor transmission were produced, and several models of cold rolled steel and later heat-treated steel were hand built and successfully tested. The feasibility of securing a patent on the basic transmission was now discussed by petitioner and Warsaw. The two men determined that an application should be filed, with the agreement that any patent secured on this or any other element of the transmission-clutch combination upon which they were working would belong to them both equally. On November 5, 1948, an application for patent on a basic transmission design was lodged with the U.S. Patent Office by Warsaw. This application was ultimately granted patent No. 2,633,759 (hereinafter referred to as the basic transmission patent) on April 7, 1953.

During the winter of 1948 and 1949 continued testing of the basic transmission revealed certain defects in the shifting mechanism. Sometime prior to July 1950, a design was perfected for eliminating these shifting defects as well as for improving the cold weather opera-

tion of the basic transmission. An application for patent on this improved transmission was filed by Warsaw on July 17, 1950, and on September 2, 1952, patent No. 2,608,878 (hereinafter referred to as the improved transmission patent) was issued covering the improved design.

Simultaneous with the development of the basic and improved transmissions, petitioner and Warsaw sought a workable design for a clutch device. In this endeavor they were hampered both by the space limitations inherent in the existing International Harvester tractor, as well as by the need for a design which would permit the use of a clutch of minimum torque capacity with reference to the ultimate output torque at the driving wheels of the tractor. During the winter of 1948–49 several models utilizing a cone-type clutch were designed by Warsaw and tested but discarded primarily as being too wide for the available space. Moreover, the use of cone-type clutch plates appears to have been unsatisfactory because of the inability of this type of clutch to absorb large torque loads the resultant of which is an undesired burden on the entire gear train of a clutch-actuated mechanism. In the spring of 1949 petitioner attended a Society of Automotive Engineers meeting in Detroit where he witnessed a flat disk-type clutch in operation on a power winch. He obtained literature on this clutch and thereafter suggested a modified version of the same to Warsaw. Because of the greater slippage factor inherent in the disk-type clutch it is able to absorb much larger torque loads for its size than comparable cone-type clutches. Thus it commended itself for use with the transmission and clutch combination being designed by Warsaw. Following petitioner's suggestion, a number of modified versions of a clutch device utilizing disk rather than cone plates were designed and sometime prior to January 1953, one was perfected for use. On January 13, 1953, a patent application covering a disk-type clutch was lodged by Warsaw with the Patent Office and on August 19, 1958, this application was granted patent No. 2,848,086 (hereinafter referred to as the clutch patent).

During the period from 1947 until January 1, 1949, all of the expenses incidental to the design, building, and testing of the basic transmission, improved transmission, and clutch were borne by petitioner through his individually owned grain company. Prior to January 1, 1949, neither the basic transmission, the improved transmission, nor the clutch had ever been commercially exploited. On January 1, 1949, petitioner and Warsaw entered into an informal partnership, the M & W Gear Co. (hereinafter referred to as the partnership), for the exploitation of these inventions. The initial and only capital invested in the partnership was $2,500 placed in the partnership bank account by petitioner. During the period January 1, 1949, to

March 17, 1950, the partnership had the use of the basic transmission invention without benefit of a formal agreement.

On February 21, 1950, the M & W Gear Co., Inc. (hereinafter referred to as the corporation), was formed under Illinois law by petitioner and Warsaw. On March 17, 1950, all of the assets of the partnership, excluding, however, any interest in the basic transmission, improved transmission, or clutch, were transferred by the partners to the corporation. On March 24, 1950, the corporation issued 300 of its 500 authorized shares of stock to petitioner (125 shares), his wife LaVerne (25 shares), and Warsaw (150 shares). These shareholdings remained constant through May 22, 1953.

On May 15, 1952, the corporation entered into the following agreement with petitioner and Warsaw:

THIS AGREEMENT made and entered into by and between the M & W GEAR COMPANY, of Anchor, Illinois, hereinafter known as First Party, and ELMO R. MEINERS and ARTHUR J. WARSAW, hereinafter known as Second Parties, WITNESSETH:

FOR THAT WHEREAS, the M & W Gear Company is engaged in the business of the manufacture and sale of certain farm machinery, equipment and accessories; and

WHEREAS, said items and parts manufactured or dealt in by said company are protected by patents pending or applied for by either the said Elmo R. Meiners or the said Arthur J. Warsaw; and

WHEREAS, the said Elmo R. Meiners and Arthur J. Warsaw have the legal title to said patents that are used by the said company in the manufacture of their products or there are patents now pending that are carried in the name of one or the other; and

WHEREAS, the said patentees desire to convey to the M & W Gear Company the sole right to manufacture under said patents or patents applied for,

IT IS, THEREFORE, AGREED, that the said M & W Gear Company shall have the sole right to use said patents or said patents applied for, or any patents to be applied for in the future, if and when such patents are tendered and used by the said M & W Gear Company, and in consideration thereof the said M & W Gear Company agrees to pay to Elmo R. Meiners 2½ per cent and to Arthur J. Warsaw 2½ per cent of all the gross sales of such equipment, articles or merchandise sold by the M & W Gear Company using said patents or patents applied for irrespective as to which of the two parties, viz: Elmo R. Meiners or Arthur J. Warsaw, may have procured the patents or applied for them, having in mind that so long as either are in possession of the rights both shall be entitled to participate in the above percentage and gross sale.

On his joint returns for the years 1958 and 1959 petitioner reported an aggregate of $13,683.64, paid to him by the corporation in respect to the basic and improved transmissions and the clutch, as long-term capital gain. In his notice of deficiency respondent determined that such amount constituted "patent royalties rather than capital gains within the meaning of section 1235(a) of the Internal Revenue Code of 1954" and was thus taxable as ordinary income.

OPINION

Section 1235 [2] provides, basically, that a transfer of all substantial rights to a patent, or of an undivided interest in all such rights to a patent, by a holder (as defined) to a person other than a related person within the meaning of section 267 (b) [3] constitutes the sale or exchange of a long-term capital asset irrespective of whether the payments made in consideration for such transfer bear a general resemblance to the payment of royalties. It is respondent's position that petitioner is precluded from the benefit conferred by section 1235 either because he was not a "holder" as defined by section 1235 (b) or because there was no "transfer" of an interest in all substantial rights to a patent within the purview of section 1235 (a). We disagree on both grounds.

Section 1235 (b) (2) defines a "holder" as any individual, who is neither the employer of nor related to the creator of a patentable device, and who has acquired an interest in such patentable device for a consideration capable of present valuation in monetary terms paid to the creator thereof prior to the actual reduction to practice of the device. As originally enacted by the House, section 1235 was limited in its benefit to the "first and original" inventor of a patentable device within the meaning of title 35 U.S.C. section 31. See H. Rept. No. 1337, 83d Cong., 2d sess., p. a280 (1954). The Senate, however, being "desirous of extending the scope of this section to cover (in addition to inventors) those individuals who contribute financially toward the de-

---

[2] SEC. 1235. SALE OR EXCHANGE OF PATENTS.

(a) GENERAL.—A transfer (other than by gift, inheritance, or device) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

(b) "HOLDER" DEFINED.—For purposes of the section, the term "holder" means—

(1) any individual whose efforts created such property, or

(2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—

(A) the employer of such creator, nor

(B) related to such creator (within the meaning of subsection (d)).

(c) EFFECTIVE DATE.—This section shall be applicable with regard to any amounts received, or payments made, pursuant to a transfer described in subsection (a) in any taxable year to which this subtitle applies, regardless of the taxable year in which such transfer occurred.

(d) RELATED PERSONS.—Subsection (a) shall not apply to any sale or exchange between an individual and any other related person (as defined in section 267(b)), except brothers and sisters, whether by the whole or half blood.

[3] SEC. 267. LOSSES, EXPENSES, AND INTEREST WITH RESPECT TO TRANSACTIONS BETWEEN RELATED TAXPAYERS.

(b) RELATIONSHIPS.—The persons referred to in subsection (a) are:

*    *    *    *    *    *    *

(2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;

velopment of the invention," S. Rept. No. 1622, 83d Cong., 2d Sess., p. 440 (1954), added to the House version of section 1235 what is now section 1235(b)(2). The effect of this addition was to extend the favorable treatment of section 1235 "to any individual [other than the employer or a close relative of the inventor] who purchases [from such inventor] an interest in the invention before the time it is actually 're-duced to practice.'" Conference Report No. 2543, 83d Cong., 2d Sess., p. 70 (1954).

We think that petitioner comes within the intendment of section 1235(b)(2). Assuming Warsaw to have been the "first and original" inventor of the basic and improved transmissions and the clutch, petitioner has established, as a first proposition, that he acquired an equal (i.e., undivided one-half) interest in such inventions from Warsaw for a consideration capable of monetary valuation. This consideration, supplied during the critical period from 1947 to January 1, 1949, when all three inventions were under development, consists, first, of his bearing the entire expense of designing, building, and testing of the inventions or prototypes thereof designed by Warsaw; second, of his housing of Warsaw; and third, of his contribution of the entire capital ($2,500) necessary to begin exploitation of the inventions by an equal partnership composed of Warsaw and himself. Petitioner has further established, and we are satisfied, that in the case of each of the three inventions for which patents were ultimately secured, his acquisition of interest therein preceded the actual reduction to practice of the device. According to respondent's regulations, "generally, an invention is reduced to actual practice when it has been tested and operated successfully under operating conditions." Sec. 1.1235–2(e), Income Tax Regs. Because petitioner paid all the expenses incidental to the design and building of the basic transmission and of prototypes of the improved transmission and clutch at a time when these devices were still under development, the interest which he acquired in them, in exchange for such payment, was *perforce* acquired prior to their actual reduction to practice since generally, actual, as opposed to constructive, reduction cannot occur prior to the successful testing of a *completed* device. Cf. sec. 1.1235–2(e), Income Tax Regs., *supra*, and see, generally, 69 C.J.S., Patents, sec. 70.

We are also satisfied that under the agreement of May 15, 1952, petitioner transferred to the corporation the undivided one-half interest which he had acquired in all substantial rights to the patents covering the basic and improved transmissions and clutch. Respondent's regulations provide that in determining whether a given transfer is a transfer of "all substantial rights to a patent" the circumstances of the entire transaction rather than merely the particular terminology

used in the instrument of transfer shall be considered. Sec. 1.1235–2(b), Income Tax Regs. Pursuant to the agreement of May 15, 1953, petitioner and Warsaw transferred to the corporation "the sole right to use" certain patents, patents pending, and patents applied or to be applied for, relating to farm machinery, equipment, and accessories manufactured or dealt in (i.e., sold) by the corporation. In our view the totality of the evidence is sufficient to establish that this agreement related to the basic transmission, improved transmission, and clutch, and it is therefore not significant that the patents covering these devices had not been issued (nor, in the case of the clutch, even applied for) when the transfer was made. *Estate of Milton P. Laurent, Sr.*, 34 T.C. 385, 399 (1960); *F. H. Philbrick*, 27 T.C. 346, 356 (1956); *Edward C. Meyers*, 6 T.C. 258, 265 (1946). Cf. sec. 1.1235–2(a), Income Tax Regs. It is further apparent from the circumstances of the whole transaction, as well as from the language used in the agreement itself, that what was being transferred was "all substantial rights" in the inventions for which the basic and improved transmission and clutch patents were ultimately issued.

Having determined that petitioner has met the requirements of section 1235(a), we now turn to a consideration of whether, as respondent contends, he is barred from its benefits either by section 1235(d) or section 1239.[4] Briefly, the application of section 1235(d) or section 1239 would bar to petitioner the benefits of section 1235(a) only if he owned, or there could be attributed to him the ownership of, "more than 50 percent" or "more than 80 percent," respectively, in value of the stock of the corporation at the time of the May 15, 1952, transfer. Since at the time of the transfer he owned directly or indirectly no more than 50 percent in value of the corporation's stock, we see no basis for applying either section. Nor do we find any merit whatsoever in respondent's argument that the precise use of the word "individual" as it appears in sections 1235(d), 267 (b)(2), and 1239(a)(2) in conjunction with the adjectives "an" and "such" means more than a single individual.

*Decision will be entered for the petitioners.*

---

[4] SEC. 1239. GAIN FROM SALE OF CERTAIN PROPERTY BETWEEN SPOUSES OR BETWEEN AN INDIVIDUAL AND A CONTROLLED CORPORATION.

(a) TREATMENT OF GAIN AS ORDINARY INCOME.—In the case of a sale or exchange, directly or indirectly, of property described in subsection (b)—

\* \* \* \* \* \* \*

(2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren;

any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231.