WALTER AND RENEE JUDA, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10026-84. Filed June 27, 1988.

*Geoffrey J. O'Connor* and *Jeffrey L. Glatzer,* counsel for the petitioners.

*Paulette Segal* and *Carmen Baerga,* counsel for the respondent.

CLAPP, *Judge:* This case has been selected as the test case for a group of docketed cases involving the same major issues arising from proposed adjustments to the partnership income tax returns of Cambridge Research & Development Group (Cambridge). Respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows:

| Year | Amount |
| --- | --- |
| 1976 | $154 |
| 1977 | [1]546 |
| 1978 | 234 |
| 1979 | 460 |
| 1980 | 613 |
| 1981 | 510 |

The issues for decision are (1) whether certain amounts received by Cambridge with respect to the transfer of patent rights qualify for capital gains treatment under section 1235;[2] (2) whether fees paid by Cambridge to find investors for limited partnerships are deductible by Cambridge as ordinary and necessary business expenses under section 162; and (3) whether Cambridge is entitled to deduct as interest expense under section 163 the difference

---

[1]Respondent increased the deficiency for the year 1977 from $526 to $546 by an amendment to his answer and consequently bears the burden of proof with respect to the increase. The increase was based on respondent's alternative position, as described below. If the Court finds for respondent on his primary theory, then respondent is not entitled to the increased deficiency for the 1977 year.

[2]Unless otherwise indicated, section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

between the face amount and the amount received on the sale of installment notes.[3]

### FINDINGS OF FACT

Some of the facts were stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners resided in Lexington, Massachusetts, at the time they filed their petition herein.

Cambridge was formed as a limited partnership by agreement dated September 15, 1966. The stated purpose of the partnership was "the ownership of certain interests in specific products and product concepts * * * and the development and commercial exploitation thereof." Cambridge amended its limited partnership agreement on January 1, 1967, on September 1, 1969, on December 1, 1971, on July 31, 1972, and on July 31, 1973, each time to allow the addition of limited partners. The amendments restated the partnership's purpose to be—

The ownership, acquisition and/or development and/or exploitation of products, processes or ideas which from time to time may become available to the Partnership, and the rendering to others of consulting and other services relating to the development and exploitation of new or existing products, processes and ideas.

The general partners of Cambridge during the years in issue were Lawrence M. Sherman and Kenneth N. Sherman. Petitioner Walter Juda (petitioner) became a limited partner in Cambridge on or about September 20, 1972, with a capital contribution of $25,000.

During its early years, Cambridge licensed products to such corporations as Colgate, Carter-Wallace, Chesebrough-Pond's, Textile Chemicals, Coty, E.R. Squibb & Sons, Richardson Merrill, Procter & Gamble, Bristol-Myers, Sony, ITT, and General Electric, receiving approximately $840,000 in advance royalties. However, Cambridge found that such corporations tended not to actively pursue the development of the licensed products. Accordingly, around 1974,

---

[3]We also deal here with petitioner's post-trial motion for permission to file a motion to strike (pursuant to Rule 52) certain matter in respondent's reply brief which petitioner claims is "scandalous and objectionable." That motion is denied.

Cambridge began the practice of organizing a limited partnership around a particular product. First, Cambridge would enter into an agreement with an inventor with respect to the patent rights to the inventor's product. Next, Cambridge would search for an entrepreneur to organize a partnership and become its general partner. Cambridge would then assist the general partner in raising capital and locating potential limited partners. The limited partnerships would subsequently purchase the rights to inventions from Cambridge. Between 1974 and 1985, Cambridge organized a partnership around each of seven inventions as follows: the medical codispenser, the family fertility indicator, the variable speech control device, a fire drill, a hearing aid device called the gold crown discriminator, a type of x-ray machine called the cardiac contraction imager, and a technique for cloning human cells.

During the years in issue, Cambridge maintained a staff of approximately 18 people consisting primarily of executives, administrators, and assistants. Prior to 1975, Cambridge employed a greater number of technical people.

For convenience, we have organized the facts of this case according to the inventions to which they relate.

### Family Fertility Indicator

Lawrence Sherman, one of the general partners of Cambridge, was the inventor of certain patents intended for use in a product called the family fertility indicator (fertility indicator). The fertility indicator is a small hand-held mechanical device that provides an individualized schedule for intercourse and abstinence designed to maximize the probability of conception. The fertility indicator is designed to help couples have a child or help them plan the birth of a child more precisely. Sherman transferred his interest in the patents to Cambridge in three different transactions in the years between 1966 and 1969. Between 1971 and 1979, he received payments from Cambridge totaling $272,522.

On November 18, 1975, Cambridge organized a limited partnership called Family Planning Laboratories (Family Planning), and the partnership purchased the patents for the fertility indicator from Cambridge on the same date.

The purchase price was $7,500,000 and consisted of $48,000 in cash, $1,462,000 in full recourse notes due and payable between January 1977 and January 1979, and a nonrecourse promissory term note in the principal amount of $5,990,000. Cambridge elected to report the sale of the patents on the installment method pursuant to section 453. Cambridge reported amounts received from the sale of these patents as capital gains in the years and amounts as follows:

| Year | Amount |
|------|--------|
| 1976 | $742,988 |
| 1977 | 29,071 |
| 1978 | 60,110 |
| 1979 | 135,141 |

Cambridge sold some of the notes it had received from the transfer of the patent rights prior to maturity of the notes. Accordingly, the face amount of each note was discounted to approximate its value at the time of the sale. In 1976, Cambridge deducted the amount of the discount, $67,328, as interest expense. Additionally, Cambridge deducted expenses for costs it incurred in locating investors for the Family Planning Limited Partnerships in the years and the amounts as follows:

| Year | Amount |
|------|--------|
| 1976 | $179,370 |
| 1978 | 4,038 |

### Variable Speech Control

Between the years 1966 and 1973, Cambridge acquired for valuable consideration a partial interest as a joint assignee in a product called variable speech control. The product is an electronic method for speeding up or slowing down the playback of recorded speech without altering its pitch or tone. The Variable Speech Control Co. (VSC) was formed as a limited partnership sometime around December 1976. Pursuant to an agreement dated December 15, 1976, VSC purchased the patent rights to the product from Cambridge and the other owners of the patents.

The purchase price for the device was $35 million and consisted of $20,000 in cash, $6,480,000 in full recourse

notes due and payable between September 1978 and September 1982, and a nonrecourse promissory term note in the principal amount of $28,500,000. Cambridge elected to report the sale of the patents on the installment method under section 453. Cambridge reported the amounts received from the sale of the patent rights as capital gain in the years and in the amounts as follows:

| Year | Amount |
|---|---|
| 1977 | $1,700,823 |
| 1978 | 831,767 |
| 1979 | 405,590 |
| 1980 | 132,890 |
| 1981 | 133,566 |

Cambridge sold some of the notes it had received from the transfer of the patent rights prior to the dates the notes matured. Accordingly, the face value of each note was discounted to approximate its value at the time of sale. Cambridge deducted the amount of the discount as interest expense in the years and in the amounts as follows:

| Year | Amount |
|---|---|
| 1977 | $202,520.00 |
| 1978 | 130,339.50 |
| 1979 | 6,856.00 |
| 1980 | 28,588.00 |
| 1981 | 17,511.00 |

Additionally, Cambridge deducted expenses for fees incurred in locating investors for the Variable Speech Control Co. limited partnership in the amounts and in the years as follows:

| Year | Amount |
|---|---|
| 1977 | $248,330.00 |
| 1978 | 76,243.00 |
| 1979 | 19,028.00 |
| 1980 | 14,573.00 |
| 1981 | 13,951.75 |

### Fire Drill

John F. Chatfield, Jr., received a patent for his invention of a hydraulically operated fire extinguishing drill (fire drill). After seeing a demonstration of Chatfield's invention on

May 13, 1976, Cambridge entered into an agreement with Chatfield with respect to the patent rights relating to the fire drill. That agreement provided in relevant part as follows:

WHEREAS, INVENTOR has conceived of, designed, and begun development of a new Hydraulically Operated Fire Extinguishing Drill, and has obtained a United States Patent, No. * * * relating to such Drill, and

WHEREAS, CAMBRIDGE wishes to acquire the rights to the Drill, and to further develop and aid in the commercialization of the Drill.

\* \* \* \* \* \* \*

## ARTICLE I
### DEFINITIONS

\* \* \* \* \* \* \*

4. The COMPANY means a business organization such as a limited partnership or corporation who shall purchase all of the right, title, and interest in and to the FIRE DRILL, the PATENT RIGHTS, and the KNOW-HOW for the purpose of thereafter commercializing the FIRE DRILL.

## ARTICLE II

1. INVENTOR hereby sells, assigns, transfers, and conveys to CAMBRIDGE, its successors and assigns (subject to the provisions of Article III hereinafter) all of the right, title and interest in and to the FIRE DRILL, the PATENT RIGHTS, and the KNOW-HOW to be held and enjoyed by CAMBRIDGE, its successors and assigns, as fully as the same would have been held and enjoyed by INVENTOR if this grant had not been made.

\* \* \* \* \* \* \*

## ARTICLE III

1. CAMBRIDGE agrees to use its best efforts to aid in the commercialization of the FIRE DRILL such as by consummating a sale of the FIRE DRILL, the PATENT RIGHTS and the KNOW-HOW to the COMPANY. Such sale shall be on terms and conditions to be determined and negotiated by CAMBRIDGE with the COMPANY, but in no event shall a sale be consummated under terms pursuant to which INVENTOR will not receive at least the following:

(a) A down payment payable by CAMBRIDGE to INVENTOR equal to fifty percent (50%) of any down payment received by CAMBRIDGE in connection with the sale of the FIRE DRILL, the PATENT RIGHTS and the KNOW-HOW to the COMPANY, after deducting CAMBRIDGE'S expenses as hereinafter defined * * * . In no event, however, shall INVENTOR'S down payment be less than a sum equal to Two Hundred and Fifty Thousand Dollars ($250,000), such $250,000 down payment consisting of a minimum of Twenty-Five Thousand

Dollars ($25,000) in cash and the balance in negotiable notes of reputable credit-worthy markers * * * . To the extent that the down payment to Cambridge consists of negotiable notes and an amount of cash in excess of $50,000, CAMBRIDGE agrees to pay INVENTOR at least fifty percent (50%) of such cash as his cash portion of the down payment. * * * plus

(b) a purchase price balance payment equal to fifty percent (50%) of the balance of the purchase price actually received by CAMBRIDGE * * * . The potential for INVENTOR'S purchase price balance payment being not less than One Million One Hundred Fifty Thousand Dollars ($1,150,000), the total balance payable being represented by a note of the COMPANY due within a period not to exceed ten (10) years and bearing interest at a rate to be negotiated between CAMBRIDGE and the COMPANY * * * .

(c) CAMBRIDGE'S responsibility in connection with the payments to INVENTOR in subparagraphs (a) and (b) above is to negotiate a sale to the company on terms producing sums sufficient to yield the amounts set out in subparagraphs (a) and (b) above. CAMBRIDGE'S liability to pay to INVENTOR the down payment and the purchase price balance payment shall arise only as and when payment to CAMBRIDGE is made by the COMPANY of the amounts negotiated for the down payment and purchase price balance. CAMBRIDGE, however, shall not assign the FIRE DRILL, the PATENT RIGHTS AND KNOW-HOW to the COMPANY unless and until payment of the down payment is made by the COMPANY to CAMBRIDGE and a concurrent payment of the INVENTOR'S DOWN PAYMENT TO INVENTOR as set forth in subparagraph (a) above.

CAMBRIDGE shall pay to INVENTOR his portion of the purchase price balance as and when such is received from the COMPANY. In the event that the COMPANY defaults on the note and CAMBRIDGE forecloses on the security, CAMBRIDGE shall reassign the patent rights and the KNOW-HOW to INVENTOR and promptly distribute to INVENTOR his share of any additional recovery it is able to make from the COMPANY on the note.

2. Upon execution of the Agreement, CAMBRIDGE shall continue, at its own expense, its exploration and evaluation of the FIRE DRILL and in this regard, shall examine the marketing and manufacturing aspects of the FIRE DRILL and its patent position, and the overall value of the FIRE DRILL as a new product to form the basis of the business of the COMPANY. CAMBRIDGE shall also carry on at its own expense such further technical development of the FIRE DRILL as it deems necessary or appropriate. These activities shall be carried on by CAMBRIDGE in a reasonable and businesslike manner and shall be actively pursued. Based on positive results of its evaluation, exploration and development activities, CAMBRIDGE shall aid the COMPANY (together with IN-VENTOR) in the determination of the amount of working capital required for the COMPANY, based on the COMPANY'S business plan, and shall negotiate with the COMPANY the terms and conditions pursuant to which the FIRE DRILL shall be sold to the COMPANY. Upon

completion of the necessary legal papers to sell the FIRE DRILL to the COMPANY, and to conduct a private offering of interests or shares in the COMPANY, CAMBRIDGE shall at the request of the COMPANY, aid the COMPANY in securing of investment capital for the COMPANY from which the COMPANY shall obtain its working capital and the funds for the down payment to be made on the purchase of the FIRE DRILL and the PATENT RIGHTS and KNOW-HOW.

3. CAMBRIDGE shall bear the responsibility for all expenses incurred in connection with the activities set out in paragraph 2. above, including (a) all out-of-pocket expenses including legal fees, accountants' fees, travel, meals and lodging, and fees to consultants, and (b) its own costs, including CAMBRIDGE'S direct employee labor costs and overhead allocated to these activities. INVENTOR shall have no responsibility or liability for any of the expenses referred to above.

4. CAMBRIDGE shall have the right, upon formation of the COMPANY and the successful consummation of the sale of the FIRE DRILL PATENT RIGHTS and KNOW-HOW to the COMPANY, to recover certain of its out-of-pocket expenses * * * in connection with the transaction to the extent it is able to do so by negotiation with the COMPANY, and these expenses whether or not recovered from the COMPANY shall not reduce or be deducted from the down payment received from the COMPANY. CAMBRIDGE'S own expenses, as defined in subparagraph (b) above, shall be fixed at $200,000 and shall be non-accountable. To the extent that CAMBRIDGE is required to actually pay financial consulting fees to third parties regarding the offering of interests or shares in the COMPANY, such fees shall be added to the $200,000 of CAMBRIDGE'S own expenses and the sum of such expenses shall be deducted from the down payment made by the COMPANY for the purchase of the FIRE DRILL, the PATENT RIGHTS and KNOW-HOW, prior to the determination of INVENTOR'S down payment but in no event shall such expenses reduce INVENTOR'S down payment to less than the amount set out in Article III, paragraph 1(a).

* * * * * * *

## ARTICLE V

1. CAMBRIDGE shall have the right to terminate this Agreement at any time if, based on its own judgment, the FIRE DRILL does not conform to its standards or criteria for the establishment of a successful venture based on the FIRE DRILL or if, in CAMBRIDGE'S judgment, the formation of the COMPANY will not be successfully completed.

2. This Agreement shall terminate on December 31, 1976, unless the formation of the COMPANY has taken place on or prior to that date.

3. If this Agreement is terminated either under paragraphs 1. or 2. above, then CAMBRIDGE shall reassign to INVENTOR all of the rights to the FIRE DRILL, the PATENT RIGHTS and the KNOW-HOW assigned by INVENTOR to CAMBRIDGE, free and clear of any liens or obligations of any nature whatsoever. This document shall under such circumstances constitute a reassignment of the rights to the FIRE

DRILL, the PATENT RIGHTS and the KNOW-HOW and shall vest title to such in the INVENTOR. CAMBRIDGE agrees to execute any further documents required or desirable to evidence INVENTOR'S rights to the FIRE DRILL, the PATENT RIGHTS and the KNOW-HOW.

A limited partnership entitled American Fire & Industrial Products Co. (Amfire) was formed as a Connecticut limited partnership on October 1, 1976. Also on October 1, 1976, Cambridge entered into an agreement entitled "Purchase Agreement" with the partners of Amfire in which Cambridge purportedly sold all the right, title, and interest to the patent for the fire drill to the partners of Amfire. That agreement provided in relevant part as follows:

1.A. Cambridge hereby sells, conveys, transfers and assigns and delivers to the Purchasers as tenants-in-common, and the Purchasers as tenants-in-common hereby purchase and acquire from Cambridge, all of Cambridge's right, title and interest in and to the Patent * * *

\* \* \* \* \* \* \*

4. Cambridge hereby represents and warrants to the Purchasers that:

A. There is no license, sub-license, commitment, contract or other agreement (in writing or otherwise) in force or contemplated with respect to the Patent which in any way affects Cambridge's right to dispose of, or sell the Patent to the Purchasers as provided herein or which grants another right to make, use or sell the Product except for an Agreement dated May 13, 1976 between Cambridge and John F. Chatfield, Jr. Cambridge validly owns the said United States Patent. * * *

\* \* \* \* \* \* \*

5. As a condition precedent to the Purchasers entering into this Agreement, Cambridge has delivered to the Purchasers the following opinion of Cambridge's general counsel: (A) Cambridge has full power and authority to sell, convey, assign, transfer and deliver the Patent as herein provided, (B) all proceedings necessary to be taken by Cambridge in connection with the transactions provided for herein and necessary to make the same effective have been duly and validly taken and this Agreement has been duly and validly authorized, executed and delivered by Cambridge and constitutes a valid and legally binding obligation of Cambridge, enforceable against Cambridge in accordance with its terms, (C) such counsel does not know or have any reason to believe that Cambridge is a party to or affected by any pending or threatened suit, action or claim relating to the Patent or that any such action or claim might materially and adversely affect the Patent, and (D) such counsel does not know that any representation or warranty made by Cambridge herein is false or inaccurate in any respect.

The assignments of the patents from Chatfield to Cambridge and from Cambridge to Amfire were both recorded in the U.S. Patent Office on January 21, 1977. Amfire received the fire drill in the same condition as when it was demonstrated to the partners of Cambridge. Amfire spent approximately 1 year redesigning the product so that it could be feasibly manufactured.

Pursuant to the agreements Cambridge entered into with Chatfield and Amfire, Cambridge and Chatfield received the following amounts:

| Year | Amount | | |
| | Cambridge | Chatfield | Total |
| --- | --- | --- | --- |
| 1976 | $60,000.00 | $10,000.00 | $70,000.00 |
| 1977 | 283,227.00 | 101,900.00 | 385,127.00 |
| 1978 | 266,090.00 | 15,458.00 | 281,548.00 |
| 1979 | 123,678.00 | 59,777.00 | 183,455.00 |
| 1980 | 48,084.00 | 41,840.00 | 89,924.00 |
| 1981 | (37,960.11) | 45,071.62 | 7,111.50 |

Cambridge treated the amounts shown in the "Total" column as the proceeds from the sale of capital assets. Cambridge treated the amounts paid to the inventor as Cambridge's basis in the patents. Cambridge deducted the fees it incurred in locating investors for the Amfire limited partnerships in the amounts and years as follows:

| Year | Amount |
| --- | --- |
| 1976 | $4,042 |
| 1977 | 207,084 |

### Gold Crown Discriminator

Rubein Johnson received four patents for his invention of a product called the gold crown discriminator during the years 1971 through 1977. The product is a small gold-plated chambered acoustic device which couples the output of a hearing aid to the ear canal of the individual user. Amplified sound from the hearing aid travels from the aid first through the hearing aid ear mold, then through the product, and then to the ear drum. The product serves to acoustically modify amplified sound by reducing feedback, decreasing background noise, and improving speech discrimination.

On August 10, 1978, Cambridge entered into an agreement with Johnson regarding the patent rights to the gold crown discriminator. That agreement was essentially the same as the agreement between Cambridge and Chatfield set forth above. Additionally, it allowed Johnson to continue the technical and commercial development of the invention subject to certain restrictions. The agreement also included a fairly detailed timetable which set forth the maximum time allowable for Cambridge to find a general partner, formulate a business plan, prepare offering materials, and complete the sale of the invention to the limited partnership. In the event the timetable requirements were not met, the agreement would terminate unless Cambridge cured the failure within 1 month. The agreement would also terminate on January 15, 1980, if the sale of the invention had not been completed by that time.

On December 29, 1978, the General Sound Co. (GSC) was formed as a limited partnership. On November 1, 1978, Cambridge and the partners of GSC entered into an agreement entitled "Purchase Agreement" with respect to the gold crown discriminator. That agreement contained the same warranties and representation by Cambridge and opinion of its counsel as those given in Cambridge's agreement with Amfire as set forth above.

There is no evidence that Cambridge made any changes to the device between the time it entered into the respective agreements with Johnson and GSC.

A letter dated May 17, 1979, from Marvin Rosenberg on behalf of Cambridge to the Commissioner of Patents and Trademarks directed the Commissioner to record the assignments of the patent rights to the gold crown discriminator in the following order:

1. From Johnson to Cambridge.
2. From Cambridge to the Limited partners of GSC.
3. From the limited partners of the General Sound Company to the General Sound Company.

All assignments were recorded on May 18, 1979.

The agreement with the partners of GSC called for a total purchase price for the patents in the amount of $6 million to be paid $70,000 in cash, $1,155,000 in negotiable promissory notes due between August 1, 1980, and Novem-

ber 1, 1981, and a nonrecourse promissory term note in the principal amount of $4,775,000. Pursuant to the agreements Cambridge entered into with Johnson and GSC, Cambridge and Johnson received the following amounts:

| | Amount | | |
|---|---|---|---|
| Year | Cambridge | Johnson | Total |
| 1979 | $342,179.00 | $192,821.00 | $535,000 |
| 1980 | 597,310.00 | 8,229.00 | 605,539 |
| 1981 | (2,117.74) | 42,235.74 | 40,118 |

Cambridge treated the amounts in the "Total" column as proceeds from the sale of capital assets. Cambridge treated the amounts paid to the inventor as Cambridge's basis in the patents. Cambridge reported capital gains in relation to its sale of patents to GSC in the years and amounts as follows:

| Year | Amount |
|---|---|
| 1977 | $1,700,000 |
| 1978 | 831,767 |
| 1979 | 405,590 |
| 1980 | 132,890 |
| 1981 | 133,566 |

Cambridge deducted as ordinary expenses fees paid to locate investors in the GSC limited partnership as follows:

| Year | Amount |
|---|---|
| 1979 | $132,058.00 |
| 1980 | 103,214.00 |
| 1981 | 10,534.40 |

At the time Cambridge entered into its agreement with Johnson, the product had been marketed by Johnson on a limited basis to more than 300 people who had been fitted with the gold crown, 150 of whom had paid for such devices. Approximately 25 percent of such individuals had purchased it at prices ranging from $65 to $166. Some individuals received the device without charge because of their association with the inventor or because the inventor wished to experiment with a variety of people with different types of hearing disabilities. A limited survey conducted by Cambridge among 45 of these individuals showed that more than 82 percent reported some improvement in hearing, and 70 percent would repurchase the product if their ear mold

containing the device was lost. However, this survey was not conducted utilizing rigorous statistical procedures, and the results reflected the subjective opinions of the individuals involved. Most individuals using the product were not tested by audiologists in connection with the use of the product. In some cases where tests were conducted, and hearing improvement had been acknowledged by the wearer, no such improvement was substantiated by the tests. Eventually, Cambridge concluded that its reliance on the experience of these users and their positive statements was misplaced. The general partner of GSC concluded that Johnson, a very charismatic man, had essentially conned both the users and Cambridge. He had taken a group of people between the ages of 60 and 90 and given them a great deal of personal attention and provided them with free ear molds and free hearing aids. Additionally, Johnson persuaded a hearing aid dealer to conduct free tests for these people, giving them as many tests as they wanted and fine-tuning their hearing aids. As a result of all the attention and benefits, the users responded positively to the device. When challenged directly, however, these people admitted that the product did not really work.

### Cardiac Contraction Imager

On March 18, 1975, Robert A. Wernikoff, of Brattle Instruments Corp. (Brattle), received a patent for his invention of a physiological synchronizer which is necessary for a device called the cardiac contraction imager. The product is an accessory for a conventional x-ray machine that allows a routine chest x-ray to display on a single film the actual excursion of the heart wall. The x-ray film shows a composite image of the heart, timed to capture the heart movement from its fully expanded to its fully contracted state, thereby clearly displaying abnormalities in pumping contractions.

On November 26, 1980, Cambridge entered into an agreement with Brattle with respect to the patent rights for the cardiac contraction imager.

That agreement was essentially the same as the agreement between Cambridge and Chatfield set forth above. Additionally, it provided that the agreement pursuant to

which Cambridge assigned the invention to the partnership was to require (1) that the partnership would not, without Brattle's consent, solicit or seek to hire as a consultant any former Brattle employee for a period of 1 year after such person left the employment of Brattle; and (2) that the partnership would purchase all its requirements of integrated x-ray equipment from Brattle for 3½ years. Further, Cambridge allowed Brattle to continue technical and commercial development and exploitation of the invention prior to its sale to the partnership. The agreement was to terminate on April 15, 1981, unless the sale of the invention had taken place by that time.

At the time Cambridge entered into its agreement with Brattle, the product had been tested at Massachusetts General Hospital where, according to published articles, it resulted in diagnostic information that showed significant correlation with the results obtained from the more invasive and expensive cardiac catheterization process. Additionally, the product was used at New England Deaconess Hospital for preoperative screening of all patients scheduled for surgery and reportedly revealed previously undetected cardiac problems in patients. Prior to the time of the Cambridge-Brattle agreement, Brattle had shipped 21 units of the cardiac imager on either a sale or lease basis and had orders for 6 more units.

On December 1, 1980, Cardiac Imaging was formed as a limited partnership. Also on December 1, 1980, Cambridge and the partners of Cardiac Imaging entered into an agreement entitled "Purchase Agreement" with respect to the cardiac contraction imager. That agreement contained the same warranties and representations by Cambridge and opinion of its counsel as those given in its agreement with Amfire as set forth above.

The agreement between Cambridge and the partners of Cardiac Imaging provided for a total purchase price in the amount of $12,525,000 to be paid by a check in the amount of $70,000, recourse promissory notes in the aggregate principal amount of $1,155,000 payable from September 1, 1982, through September 1, 1983, and a nonrecourse promissory note in the principal amount of $11,300,000. Pursuant to the agreements Cambridge entered into with Brattle

and Cardiac Imaging, in 1981, Cambridge received $918,754.50 and Brattle received $167,459.50 for a total of $1,086,214. Cambridge treated the total amount as proceeds from the sale of a capital asset. Cambridge treated the amount paid to the inventor as Cambridge's basis in the assets.

Cambridge deducted as ordinary expenses, fees it incurred in finding investors for the Cardiac Imaging limited partnership in 1981 in the amount of $198,750.

With respect to the assignment of the patent rights from Brattle to Cambridge and from Cambridge to the partners of Cardiac Imaging, the record does not disclose the date those assignments were recorded with the U.S. Department of Commerce Patent and Trademark Office. There is no evidence that Cambridge made any changes to the cardiac imager between the time it entered into the respective agreements with Brattle and Cardiac Imaging.

Followup surveys conducted by Cardiac Imaging revealed that users of the Brattle devices were having a number of problems with the product. Several users reported that vibration from the machine or the slightest movement from the patient would result in a fuzzy picture. The results from the device were frequently characterized as unreliable, and cardiologists and surgeons expressed only lukewarm interest in the device. In response to these complaints, Cardiac Imaging redesigned the machine, changing the technique by which the plates and grids were manufactured as well as the overall configuration of the integrated circuitry. However, despite the changes made by Cardiac Imaging, the product met with only limited success. It appears that none of the Cardiac Imaging machines which were made by Brattle in 1980 and 1981 are still in operation today.

## OPINION

The arguments of the parties can best be understood if grouped according to the invention to which they relate. With respect to the fire drill, the gold crown discriminator, and the cardiac contraction imager, respondent asserts that Cambridge (and consequently, petitioner) is not entitled to treat the amounts it received on the transfer of the patent rights as capital gain pursuant to section 1235 because (1)

Cambridge did not acquire an interest in the patents; (2) Cambridge did not give consideration in money or money's worth to the creator of the patent; and (3) even if Cambridge did acquire an interest in exchange for consideration in money or money's worth paid to the creator of the invention, that interests in the gold crown discriminator and cardiac contraction imager were not acquired prior to actual reduction to practice of the invention. Respondent argues that Cambridge essentially acted as an agent of the inventors in brokering the inventions. Petitioner contests respondent's challenge to Cambridge's ownership of the patents and claims it meets the requirements under section 1235.

With respect to the patents for the family fertility indicator and the variable speech control, respondent concedes that the transfer of those patent rights entitles Cambridge (and petitioner) to treat the amounts received as long-term capital gain pursuant to section 1235.[4] However, respondent asserts that Cambridge must treat the fees it paid to find investors in the Family Planning Laboratories and the Variable Speech Control limited partnerships as an offset against the sales price of the patents. Respondent has allowed the deduction of these expenses with respect to the limited partnerships organized around the fire drill, the gold crown discriminator, and the cardiac contraction imager because respondent's primary position is that the transfer of those patent rights resulted in ordinary income. However, in the event we conclude that those transfers were within section 1235 and must be treated as transfers of capital assets, respondent asserts as an alternative argument that the fees paid to find investors in those limited partnerships are not deductible. Petitioner argues that such expenses are deductible as ordinary and necessary business expenses under section 162.

Finally, with respect to the notes held by Cambridge from the sale of the patent rights to the family fertility indicator and the variable speech control, respondent argues that Cambridge is not entitled to deduct as interest expense

---

[4]Respondent conceded that Cambridge's partners were "holders" as defined in sec. 1235 because Cambridge's partners were the inventors of these products and they assigned the patents to Cambridge for valuable consideration.

under section 163 the difference between the face amount and the amount it realized on the sale of those notes. Respondent has allowed these deductions with respect to sales of notes held by Cambridge from its transfers of patents to the fire drill, the gold crown discriminator, and the cardiac contraction imager because respondent's primary position is that those transfers were not within section 1235 and therefore resulted in ordinary income. Accordingly, respondent asserts that the net result is correct despite the incorrect reporting method. However, in the event we conclude that the transfers were within section 1235 and must be treated as transfers of capital assets, then respondent also challenges the deductions of interest expense on these notes. Petitioners assert that such discount constitutes an amount paid for the use of money and is therefore deductible as interest.

## Section 1235 Issue

Section 1235[5] provides that a transfer of all substantial rights to a patent, or of an undivided interest in all such rights to a patent by a holder (as defined) to a person other than a related person will be treated as the sale or exchange of a long-term capital asset. Under the circumstances of this case, whether Cambridge is entitled to treat its income from the transfer of the patent rights to the fire drill, the gold crown discriminator, and the cardiac contraction imager as long-term capital gain depends on whether Cambridge has acquired "all substantial rights" to the patents in order to transfer them within the meaning of

---

[5] SEC. 1235. SALE OR EXCHANGE OF PATENTS.

(a) GENERAL.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

 (1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

 (2) contingent on the productivity, use, or disposition of the property transferred.

(b) "HOLDER" DEFINED.—For purposes of this section, the term "holder" means—

 (1) any individual whose efforts created such property, or

 (2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—

 (A) the employer of such creator, nor

 (B) related to such creator (within the meaning of subsection (d)).

section 1235(a) and, if so, whether Cambridge was a holder[6] within the meaning of section 1235(b).

A patent is a grant for a term of 17 years of the right to exclude others from making, using, or selling the invention. 35 U.S.C. sec. 154 (1982). A patent has been referred to as a "bundle of rights," and a patentee may authorize another to exploit some or all of those rights by license or assignment. See *Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891). However, under section 1235(a) one must transfer *all substantial rights to a patent*, or an undivided interest therein, in order for the proceeds from the transfer to be entitled to long-term capital gain treatment. Both petitioner's and respondent's briefs reflect the assumption that in order to *transfer* all substantial rights, a holder must first have *acquired* all substantial rights. Accordingly, the parties have tailored their arguments on this issue to address the question of whether Cambridge acquired all substantial rights to the patents. The circumstances of the whole transaction, rather than the particular terminology used in the instrument of transfer, shall be considered in determining whether or not all substantial rights to a patent are transferred in a transaction. Sec. 1.1235-2(b), Income Tax Regs. Our examination of the agreements entered into by Cambridge with the various inventors leads us to conclude that the interest so acquired, if any, is insufficient to make Cambridge the possessor of all substantial rights in the patents.

Petitioners have consistently argued that the agreements between Cambridge and the inventors vested in Cambridge full ownership rights. However, a number of provisions in those agreements undermine that argument.

In each agreement, the provision whereby the inventor "sold, assigned, transferred, and conveyed" the patent rights to Cambridge was clearly made subject to other provisions which required Cambridge to create a "company" (all the companies involved here were limited partnerships) and transfer the rights to that company. Thus, Cambridge's "ownership" consisted merely of its right to organize a

---

[6]Although a partnership cannot be a holder, each member of a partnership who is an individual may qualify as a holder as to his share of a patent owned by the partnership. Sec. 1.1235-2(d)(2), Income Tax Regs. Since petitioner's status as a holder is dependent upon actions taken by Cambridge, we will refer to petitioner and Cambridge interchangeably.

partnership around the product. This impression is reinforced by the fact that each agreement contained a provision terminating the agreement unless the formation of a company had taken place on or prior to a certain date.[7] There is no indication in the record that Cambridge ever intended to exploit the patents in any way other than through a subsequent sale to another company. It is quite clear that Cambridge itself had no manufacturing capabilities and was engaged primarily in screening patents and organizing limited partnerships.

In each agreement, Cambridge's liability to pay the downpayment and the balance of the purchase price would arise only if and when payment to Cambridge was made by the limited partnership to which Cambridge had sold the patent rights. Further, if Cambridge was forced to foreclose on the security (the patent rights), the rights were to be reassigned or would revert automatically to the inventor, not to Cambridge. Our review of the agreements read in their entirety and the actions of the parties lead us to conclude that Cambridge did not acquire a sufficient interest in the patents to constitute all substantial rights. Cambridge's role was more analogous to that of a broker, "finder," or "middleman." Hence, Cambridge was not in a position to transfer all substantial rights under section 1235(a).

Our conclusion that Cambridge did not acquire a sufficient interest in the patents effectively disposes of this issue. Nevertheless, for purposes of complete discussion, we will assume that Cambridge did own all substantial rights in the patents and transferred same to the partnerships. This leads to the question of whether the transfer was "by any holder" and whether Cambridge was a holder under section 1235(b)(2). We will discuss two requirements of "holder" status. Section 1235(b) defines a holder as either an individual whose efforts created the property, or any other individual who has acquired his interest in the property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to

---

[7]Previously, in determining whether all substantial rights have been transferred, we have held that an agreement giving either party the right to terminate at the end of 10 years was not a sale. *Taylor-Winfield Corp. v. Commissioner,* 57 T.C. 205, 217 (1971), affd. 467 F.2d 483 (6th Cir. 1972); see also *Kaczmarek v. Commissioner,* T.C. Memo. 1982-66.

practice of the invention covered by the patent, if such individual is neither the employer of the creator nor related to the creator. It is clear with respect to these three inventions that none of the individual partners of Cambridge created the property, nor is any partner the employer of or related to the creator. Accordingly, resolution of this issue turns on whether the partners of Cambridge acquired an interest in the property in exchange for consideration in money or money's worth paid to the creator prior to actual reduction to practice of the invention covered by the patent.

Petitioner argues that consideration in money or money's worth was paid to the creator in two ways. First, petitioner asserts that consideration was paid to the creator by the substantial cash payments made to the inventors upon the sale of the patents by Cambridge to the various partnerships. Petitioner asserts that these cash payments explicitly satisfy the terms of the statute. Second, petitioner argues that Cambridge paid money's worth to each inventor in the form of market research, patent analyses, and technical product improvements during the period that Cambridge studied and owned the patents. Petitioner asserts that this constitutes consideration in money's worth because the patents would be substantially more valuable because of Cambridge's efforts if ownership reverted to the inventors.

The cash received by the inventors came from the limited partnerships, not from Cambridge's own pockets. Cambridge was not required to make any payments to the inventors unless and until it sold the patent rights. Accordingly, those amounts cannot be construed as payments to the creators from Cambridge.

With respect to the determination of whether Cambridge paid consideration in money's worth, it is relevant to note the legislative history of that provision in section 1235. That language was included to reflect congressional intent that "holder" status be conferred upon those who contributed financially to the development of the patent. S. Rept. 1622, 83d Cong., 2d Sess. 440 (1954). Consideration in money's worth was stated to be consideration capable of present valuation in monetary terms. In *Meiners v. Commissioner,* 42 T.C. 653, 658 (1964), we considered the

question of consideration in money's worth. We noted there that the consideration was supplied during the critical period when the inventions at issue were under development. The taxpayer bore the entire expense of designing, building, and testing the inventions or prototypes designed by the inventor. Additionally, the taxpayer housed the inventor and contributed the entire capital necessary to begin exploitation of the inventions.[8] Our review of the facts in this case leads us to the conclusion that Cambridge did not give the inventors consideration in money's worth capable of present valuation. We believe Cambridge incurred some expenses with respect to the patents although the record contains no evidence substantiating these expenses. However, we are not persuaded that those expenses were incurred to develop the product. Rather, we conclude that Cambridge incurred expenses in marketing the products.

This conclusion is supported by several facts. For example, the general partner of Amfire received the prototype of the fire drill in the same condition as it had been when presented to Cambridge by the inventor. Amfire was required to procure drawings and to build a new prototype suitable for testing the product. With respect to the gold crown discriminator, the only evidence of expenditures made by Cambridge relates to a survey it conducted of the users which indicated they were satisfied with the product. Finally, nothing in the record suggests that Cambridge made any developmental changes to the cardiac contraction imager. Accordingly, we must conclude that the amounts expended, if any, were not for the development of the product as contemplated by Congress.

Furthermore, we are not persuaded by petitioner's argument that Cambridge paid consideration in money's worth because a reversion of the patents to the inventors would have given the inventors patents which were substantially more valuable due to Cambridge's work. Even if this were consideration, it was not given to *acquire* an interest in the patent. Rather, it would have been given only if the patent

---

[8]See also *Bostroem v. Commissioner,* T.C. Memo. 1974-156. There we concluded that a taxpayer who had entered into an agreement with the inventor pursuant to which the taxpayer agreed to finance patent applications in certain European countries in exchange for equal rights in any patents that were issued was a holder within the meaning of sec. 1235(b).

reverted to the inventor. The potential reversion of a patent which has been the subject of market research does not constitute consideration capable of present valuation in monetary terms. There is no evidence that at the time the parties entered into the agreement, they valued in monetary terms the possibility that the patent would revert to the inventor. For the foregoing reasons, we must conclude that Cambridge (and petitioners) did not pay money or money's worth to the creator.

The final element essential to holder status is the requirement that the interest in the patent be acquired prior to actual reduction to practice of the invention covered by the patent. Respondent asserts that Cambridge did not acquire the rights to the gold crown discriminator or the cardiac imager prior to their reduction to practice.[9] Petitioner asserts that Cambridge acquired its interest in the products prior to their reduction to practice because they were never reduced to practice.

Section 1.1235-2(e), Income Tax Regs., states:

> Actual Reduction to Practice. For the purposes of determining whether an individual is a holder under paragraph (d) of this section, the term "actual reduction to practice" has the same meaning as it does under section 102(g) of title 35 of the United States Code. Generally, an invention is reduced to actual practice when it has been tested and operated successfully under operating conditions. This may occur either before or after application for a patent but cannot occur later than the earliest time that commercial exploitation of the invention occurs.

A patent can be actually reduced to practice although the device has not been a commercial success, or if the machine patented is imperfect in its operation, so long as it actually works even if in a crude way. *Hildreth v. Mastoras,* 257 U.S. 27 (1921).

The materials of the private offering memorandum of the General Sound Co. limited partnership state that Johnson, the inventor, sold at least 150 gold crown discriminators prior to the time he entered into the agreement with Cambridge. We must conclude that these sales constitute the commercial exploitation of the invention. Accordingly,

---

[9] If the Court had found that Cambridge acquired an interest in the fire drill for money or money's worth, then respondent would have conceded that it was acquired prior to its actual reduction to practice.

the patent was reduced to practice prior to the time Cambridge entered into its agreement with Johnson. Petitioner argues that despite the initial favorable response of the users, the products did not really work and, therefore, cannot be considered to have been reduced to practice. In our opinion, however, the fact that the gold crown discriminator had been commercially exploited renders irrelevant the fact that the product may not have performed satisfactorily.

The materials accompanying the private offering memorandum of the Cardiac Imaging limited partnership state that the cardiac contraction imager was commercially available prior to May 28, 1976, and that by November 11, 1980 (several weeks prior to the Brattle-Cambridge agreement), Brattle had already leased or sold 21 units with an additional 6 on order. Again, we must conclude that this commercial exploitation of the product constituted its reduction to practice. Petitioner asserts that the product never worked adequately and points to numerous letters from unhappy users of the device. Again, however, since reduction to practice cannot occur later than the earliest time that commercial exploitation of the invention occurs, this factor is irrelevant.

For the foregoing reasons, we conclude that Cambridge (and petitioner) cannot be considered a holder of the patents under section 1235(b) because it did not acquire an interest in any of the three patents in exchange for consideration in money or money's worth paid to the creator and, with respect to the gold crown discriminator and the cardiac contraction imager, Cambridge did not acquire whatever interest it had prior to actual reduction to practice of the inventions covered by the patents.

*Deductibility of Fees Paid to Locate Investors*

The next issue for decision is whether, with respect to the family fertility indicator and the variable speech control patents, the fees paid to locate investors for the limited partnerships organized around the inventions are deductible by Cambridge as ordinary and necessary expenses under section 162.

Petitioner argues that the fees paid to locate investors are deductible because they constitute ordinary and necessary expenses directly connected to Cambridge's trade or business. Respondent asserts that even if Cambridge was engaged in a trade or business, the fees paid were costs incurred with respect to the sale of capital assets and must be offset against the selling price of the assets.

Section 162 allows the deduction of all ordinary and necessary expenses incurred in carrying on a trade or business. In order to be engaged in carrying on a trade or business, the taxpayer must be involved in the activity with continuity and regularity, and the taxpayer's primary purpose for engaging in the activity must be for income or profit. *Commissioner v. Groetzinger*, 480 U.S. 23 (1987). We are satisfied that Cambridge was engaged in a trade or business. This conclusion presents us with the situation of an entity engaged in a trade or business which produces capital gain.[10]

Respondent has conceded that the transfer of rights by Cambridge with respect to the family fertility indicator and the variable speech control qualified as transfers of all substantial rights to a patent by a holder within the meaning of section 1235. Accordingly, those transfers are to be considered as sales or exchanges of capital assets. Sec. 1235.

It is well settled that expenses incurred with respect to the sale of a capital asset are not currently deductible but rather must be offset against the amount received from the sale. Sec. 263; sec. 1.263(a)-2(e), Income Tax Regs.; *Issac G. Johnson & Co. v. United States*, 149 F.2d 851 (2d Cir. 1945); *Gunn v. Commissioner*, 49 T.C. 38 (1967). Since the fees at issue here were incurred in a trade and business, as well as being costs incurred with respect to the sale of a capital asset, we must resolve a conflict between competing principles of tax law.

There is no indication that section 1235 treats an asset as capital for some purposes and not for others. Therefore, we conclude that consistency requires that we treat sales of

---

[10]A similar situation arose in *King v. Commissioner*, 89 T.C. 445 (1987). There we discussed the investment interest limitations of sec. 163(d) with respect to a trader of commodity futures.

capital assets similarly, even where, as here, the taxpayer is engaged in the trade or business of selling such assets. Accordingly, Cambridge is not entitled to deduct under section 162 the fees it paid to locate investors in the limited partnerships organized to purchase the family fertility indicator and the variable speech control.

### Interest Expense

The final issue is whether the difference between the face amount and the amount realized (discount) by Cambridge on the sale of notes held by Cambridge from the sale of the fertility indicator and variable speech control patents constitutes an amount deductible as interest expense under section 163. Petitioner argues that the discount constitutes an amount paid for the use of the money presently rather than waiting until the note matured. Respondent challenges the deduction of these amounts.

Section 163(a) states that "there shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." The deduction is for interest on indebtedness of the taxpayer, and where no indebtedness exists no deduction is allowed. Sec. 1.163-1(a), Income Tax Regs.

In support of his argument, petitioner has cited us to *Deputy v. du Pont,* 308 U.S. 488, 498 (1940), wherein the Supreme Court stated that the term "interest on indebtedness" means compensation for the use or forbearance of money. Petitioner's argument is flawed because of its focus on the meaning of the term "interest" while ignoring the requirement of indebtedness. Here the notes sold by Cambridge were notes on which Cambridge was the creditor, not the debtor. Accordingly, there is no indebtedness of Cambridge (or petitioner) on which interest was paid.

The installment notes sold by Cambridge were notes it had received from sales of capital assets (patents to the fertility indicator and the variable speech control). Where an installment obligation is acquired on the sale of a capital asset, gain on the disposition of the obligation is capital gain. Cambridge reported the sales on the installment method with the result that payments on the note were taken into gross income when made, and tax on the

proportionate part of the gain was paid at those times. The discounting of the notes was merely an acceleration of the installment payments to the extent of the amount received. Sec. 453(d);[11] *Crane v. Helvering,* 30 B.T.A. 29 (1934), affd. 76 F.2d 99 (2d Cir. 1935). Petitioner must include in income as long-term capital gain his proportionate share of the gain realized on the sale of the notes.[12]

*Decision will be entered for the respondent.*

---

[11]We note that sec. 453 was changed under the Installment Sales Revision Act of 1980, Pub. L. 96-471, 94 Stat. 2247, for years ending after Oct. 19, 1980. The transactions involved herein occurred prior to the change in law and references to sec. 453 are to pre-Oct. 19, 1980, law.

[12]Since we have determined that Cambridge's transactions with respect to the fire drill, the gold crown discriminator, and the cardiac contraction imager are not to be treated as the sale or exchange of capital assets under sec. 1235, no adjustment is necessary to the treatment of income received from the sales and notes with respect to those patents. This is because the income from those notes was ordinary income (sec. 453(d)) and the net result is the same regardless of whether petitioners include the face amount of the notes sold and then deduct the difference between the face and the amount realized, or just report the amount realized.

