T.C. Memo. 1998-389

UNITED STATES TAX COURT

STEPHEN S. WANG, JR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15228-96.                    Filed November 2, 1998.

<u>Mark D. Pastor</u> and <u>Robert T. Leonard</u>, for petitioner.

<u>Ronald M. Rosen</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined a deficiency in
petitioner's Federal income tax for 1987 of $57,091, additions to
tax for fraud under section 6653(b)(1)(A)[1] and (B) of $42,818 and
50 percent of the interest due on $57,091, respectively, and an

---

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code for the year in issue, and all Rule
references are to the Tax Court Rules of Practice and Procedure.

addition to tax for substantial understatement of tax under section 6661 of $14,273.

In the answer, respondent asserted additions to tax for negligence under section 6653(a) in the alternative to additions to tax for fraud. At trial and on brief, respondent sought an increased deficiency and increased additions to tax as a result of the parties' stipulation that petitioner had unreported income of $4,000 for taxable year 1987 in addition to the $150,000 unreported income determined by respondent in the deficiency notice.

The issues for our consideration are: (1) Whether petitioner is entitled to deduct legal fees or disgorgement payments as business expenses under section 162 or section 165; (2) whether petitioner's deductions or losses resulted in a net operating loss (NOL); (3) if petitioner is not entitled to an NOL, whether he is entitled to the computational benefits of section 1341 with respect to the disgorgement payment; (4) whether petitioner is liable, in the alternative, for additions to tax for fraud under section 6653(b)(1)(A) and (B) or for negligence under section 6653(a)(1)(A) and (B); and (5) whether petitioner is liable for an addition to tax for a substantial understatement under section 6661.

FINDINGS OF FACT[2]

At the time the petition was filed, petitioner resided in Irvine, California. From the fall of 1982 through the spring of 1986, petitioner attended the University of Illinois at Urbana-Champaign, majoring in finance. Petitioner left college after the spring 1986 semester, only nine credits short of his bachelor's degree. In December 1989, he completed the necessary credits and received a bachelor of science degree in finance with high honors.

Petitioner left college in 1986 to work for Morgan Stanley & Co. (Morgan Stanley), a New York investment banking firm, for a 2-year internship as a junior analyst. Initially, petitioner worked in the Leveraged Buyout Unit of Morgan Stanley's Merchant Banking Department. He was transferred to the Mergers and Acquisitions Department in March 1987 because of unsatisfactory work performance and remained in that department until June 1988. During the course of his employment at Morgan Stanley, petitioner was privy to confidential business information. Some of the information was nonpublic or insider information regarding Morgan Stanley's clients involved in actual and anticipated corporate combinations and other transactions, such as mergers, tender offers, and leveraged buyouts. Petitioner was contractually and

---

[2] The stipulation of facts and the attached exhibits are incorporated herein by this reference.

statutorily obligated to keep the information confidential and not to use or disclose it for his personal benefit.

In late 1986, petitioner met Mr. Fred Lee, who was then a client of Morgan Stanley. Mr. Lee, a Taiwanese national, owned or had trading authority over a large number of securities and trading accounts with several domestic and foreign brokerage firms. Sometime in 1987, petitioner began selling insider information to Mr. Lee. That information had been obtained in the course of petitioner's employment at Morgan Stanley. Mr. Lee used the insider information to buy and sell corporate securities, earning an overall profit of approximately $19 million from June 1987 through June 1988.

Mr. Lee paid petitioner, at minimum, $150,000 and $50,000 for the insider information during 1987 and 1988, respectively. Petitioner admitted that he and Mr. Lee had discussed petitioner's receiving an additional $1 million in compensation. Petitioner received some cash payments directly from Mr. Lee. Petitioner also received payments in the form of deposits to a bank account opened in fictitious or nominee names chosen by Mr. Lee. Petitioner had a power of attorney over the bank account. In 1987, Mr. Lee paid petitioner at least $50,000 in cash and $100,000 that was deposited by Mr. Lee into the bank account. Petitioner spent the $50,000 within a year and did not deposit any of it into a bank account or keep any record of the money.

Mr. Lee deposited an additional $50,000 into the bank account in February 1988. In 1987, petitioner also sold insider information to Mr. Jerome Cronin, a former University of Illinois classmate, in exchange for $4,000.

On June 27, 1988, the Securities and Exchange Commission (SEC) instituted a civil action against petitioner and Mr. Lee in the U.S. District Court for the Southern District of New York for alleged violations of sections 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. secs. 78j(b) and 78n(e), and SEC Rules 10b-5 and 14e-3, 17 C.F.R. secs. 240.10b-5 and 240.14e-3, promulgated thereunder. SEC v. Wang, 88 Civ. No. 4461 (RO) (S.D.N.Y.). The civil complaint contained allegations that Mr. Lee purchased insider information from petitioner about 25 companies and used that information to purchase securities. The SEC sought preliminary and permanent injunctions prohibiting petitioner and Mr. Lee from participating in alleged securities law violations and from disposing of their assets. The SEC also sought to have petitioner and Mr. Lee disgorge their profits derived from the insider information petitioner had sold to Mr. Lee. Petitioner entered into a settlement of the civil action with the SEC and agreed to disgorge $125,000, the amount remaining in the nominee bank account. In 1988, the disgorgement was placed in a receivership fund to be used as restitution for investors who could show a loss due to petitioner's and Mr. Lee's

illegal actions.  The disgorgement was not a fine or penalty paid to the Government within the meaning of section 162(f).

On September 7, 1988, the Federal Government filed a three-count criminal information against petitioner in the U.S. District Court for the Southern District of New York, charging him with one count each of mail fraud, 18 U.S.C. sec. 1341, wire fraud, 18 U.S.C. sec. 1343, and securities fraud, 15 U.S.C. secs. 78j(b) and 78ff and 17 C.F.R. sec. 240.10b-5.  United States v. Wang, docket No. 88 Commissioner. 0615 (KTD) (S.D.N.Y.).  It was alleged that petitioner had taken or stolen confidential business information from Morgan Stanley and its clients.  The information contained the names of 5 companies about which petitioner provided insider information to Mr. Lee and Mr. Cronin and also contained charges that insider trading occurred with respect to at least 19 companies.  Petitioner waived indictment and pled guilty to each criminal count.  He was sentenced to 3 years' imprisonment and 3 years' probation.  Petitioner served approximately 8 months in a Federal prison, from December 1988 to August 1989.

Petitioner engaged two law firms to represent him in legal matters arising from his insider trading.  During 1988 and 1989, petitioner incurred legal fees and litigation costs that totaled $110,857.43.  Petitioner's father, Stephen S. Wang, Sr., paid petitioner's legal bills in the amounts of $60,000 and $50,857.43

during 1988 and 1989, respectively.  Mr. Wang, Sr., used savings, borrowed money, employer savings plan withdrawals, and vacation time converted to cash in order to pay his son's legal expenses. Before petitioner's incarceration, Mr. Wang, Sr., made out the checks for the legal fees jointly to petitioner and the law firm and gave the checks to petitioner.  After petitioner's incarceration, Mr. Wang, Sr., issued his checks directly to the law firm and did not obtain petitioner's endorsement.  Although Mr. Wang, Sr., liquidated assets and incurred debt to pay about $110,000 of his son's legal expenses, in 1993 he sold stock in a Taiwanese company for over $2 million.

In 1988, petitioner, in connection with the legal expenses, executed three promissory notes to his father totaling $115,000 (1988 notes).  The first note was drafted by an attorney for Mr. Wang, Sr., and was used as a model for the two subsequent notes. The notes were unsecured, did not require monthly payments, and did not begin to accrue interest until 1993.  In January 1993, petitioner executed a note to replace the 1988 notes and extended the maturity date for 5 years, providing for accrual of interest during the extended period.  As of the time of trial, petitioner had not made any payments of interest or principal on the replacement note or the 1988 notes.

On his 1987 tax return, petitioner reported gross income of $39,521.55, consisting of wages from Morgan Stanley and $67 of

taxable interest income. He did not report his $154,000 insider trading income, $150,000 of which was included in his gross income by respondent. On his 1988 tax return, petitioner reported gross income of $17,026.85, his wages from Morgan Stanley, and he did not report the $50,000 insider trading income included in his gross income by respondent. For 1988, respondent allowed petitioner a $125,000 deduction for the disgorgement of his insider trading income, which resulted in no tax deficiency for that year. Respondent determined, however, that the disgorgement deduction was not in connection with a trade or business and, accordingly, did not generate a 1988 NOL that could be carried back to 1987. Under respondent's determination, most (about $75,000) of the $125,000 disgorgement deduction remained effectively nondeductible.

On January 25, 1994, petitioner executed a Form 872, Consent to Extend the Time to Assess Tax, intended to extend the 1987 assessment period to December 31, 1994. The Form 872 was executed after April 15, 1991, after the normal 3-year period for assessment under section 6501(a) had expired. The Form 872 was executed before April 15, 1994, within the 6-year period for assessment under section 6501(e)(1) (that section applies where substantial omissions from gross income exist). The Form 872, however, did not contain any explanation or indication of whether the period for assessment was then open or under which particular

provision it may be open for the 1987 tax year.  When he signed the Form 872, petitioner was represented by an attorney who also signed the form.  Subsequently, on or about June 1, 1994, and August 2, 1995, the parties executed Forms 872 to extend the 1987 assessment period to December 31, 1995, and December 31, 1996, respectively.  The notice of deficiency was mailed on April 16, 1996.

## OPINION

### 1987--Period for Assessment

As a preliminary matter, we consider petitioner's contention that the 1987 assessment period had expired before respondent mailed the notice of deficiency.  There was in excess of a 25-percent omission of gross income on petitioner's 1987 tax return, and the 6-year period for assessment is applicable.  See sec. 6501(e)(1).  Petitioner executed a Form 872 in January 1994, before the 6-year assessment period expired.  Petitioner contends that the Form 872 is invalid or without effect because it did not specify that the 6-year assessment period was applicable.  Accordingly, petitioner argues that the assessment period expired before the notice of deficiency was mailed.

An agreement to extend the assessment period must be executed before the expiration of the applicable statutory period for assessment or the period agreed upon by the taxpayer and the Secretary in a prior agreement.  Sec. 6501(c)(4).  There is no

requirement, however, that the parties' consent or agreement contain a reference to the applicable statutory provision under which the assessment period remains open.

Additionally, our holding that petitioner filed a fraudulent 1987 return would also permit the tax for that year to be assessed at any time. See sec. 6501(c)(1). Therefore, the 1987 assessment period had not expired at the time respondent mailed the notice of deficiency to petitioner.

Was Petitioner's Activity a Trade or Business?

Petitioner has admitted that he had unreported income in the amounts of $154,000 and $50,000 for 1987 and 1988, respectively. Petitioner's $125,000 deduction claimed for the 1988 disgorgement was allowed, but it only affected the $50,000 of the insider information income earned for 1988, because respondent disallowed any carryback to the $154,000 earned in 1987.[3] Petitioner also seeks to claim legal expenses of $60,000 and $50,857.43 paid during 1988 and 1989, respectively. Respondent disallowed those deductions on the grounds that they were not paid by petitioner and/or were not incurred in a trade or business.

---

[3] Because of respondent's allowing $50,000 of the $125,000 disgorgement deduction against the $50,000 of unreported income, no deficiency was determined for 1988. Because respondent determined that petitioner was not in a trade or business, no part of the $75,000 difference that was not deductible in 1988 could be carried to other taxable years.

The parties advanced several arguments, and the pivotal question for each is whether petitioner was in a trade or business. Although respondent determined that petitioner is entitled to a deduction for the disgorgement, an NOL was disallowed because of the determination that petitioner's activity was not a trade or business, a prerequisite here for a carryback.[4] In that context, we must decide whether petitioner was in a separate trade and/or business of selling insider information or whether the expenses were connected with petitioner's status as an employee.

Petitioner stipulated that he had unreported income of $154,000[5] in 1987 from the sale of insider information. Petitioner contends that he is not liable for an income tax deficiency for 1987 because he sustained NOL's for 1988 and 1989 that may be carried back to 1987. In particular, petitioner argues that he is entitled to deduct legal expenses in 1988 and 1989 and the disgorgement of his insider trading profits in 1988 as business expenses. He contends that the legal fees and

---

[4] Respondent did not argue or determine that the deduction for the disgorgement or the allowance of a net operating loss (NOL) was against public policy.

[5] In the deficiency notice, respondent determined unreported income of $150,000. Respondent did not seek to amend the answer, but at trial and on brief sought an increased deficiency and additions to tax. Petitioner's admission that he had unreported income of $154,000 caused the issue to have been tried by consent of the parties. See Rule 41(b).

disgorgement were related to "his business activities in the securities industry" and, therefore, are deductible business expenses. Respondent maintains that petitioner's expenditures are not business expenses because his insider trading activity was not related to his employment at Morgan Stanley and petitioner was not in a separate trade or business of selling insider information. Respondent has permitted petitioner to deduct the disgorgement under section 165(c)(2) as a loss incurred in an activity entered into for profit that does not constitute a trade or business. A section 165(c)(2) nonbusiness loss deduction cannot create an NOL carryback. Sec. 172(d)(4). Respondent also argues that petitioner is not entitled to deduct the legal expenses under either section 162 or 212 because the expenses were paid by petitioner's father.

The first issue for our consideration is whether petitioner's selling of insider information constituted a trade or business. Petitioner asserts that the sale of insider information was in connection with his employment at Morgan Stanley and that his job provided him with the opportunity and means to engage in insider trading. Petitioner also argues that he made the disgorgement to protect his business reputation and future employment. Although petitioner obtained the insider information in the course of his position with Morgan Stanley, his use and disclosure of the information for profit was not

within the scope of his employment.  Petitioner violated his confidentiality agreement with Morgan Stanley by disclosing and using for his personal gain confidential information that he acquired through his employment.

Respondent attempts to analogize petitioner's actions to those of an employee who embezzles money from his employer. Repayment of embezzled funds is not an ordinary and necessary business expense of being an employee because an embezzler does not act in the course of his employment when taking the money. See, e.g., Yerkie v. Commissioner, 67 T.C. 388, 393-394 (1976); Morrison v. Commissioner, T.C. Memo. 1981-617; Whitler v. Commissioner, T.C. Memo. 1980-214.  Petitioner's use and disclosure of the insider information was not in connection with or furtherance of his employment or for a business purpose of his employer, Morgan Stanley.  Cf. O'Malley v. Commissioner, 91 T.C. 352, 363-364 (1988) (bribery charge against taxpayer related to his employment because bribe advanced purposes of employer although taxpayer's employer did not instruct him to offer bribe).  While petitioner's sale of insider information was facilitated by his employment, it was not directly or proximately related to his job at Morgan Stanley.  Petitioner is not entitled to deduct the legal fees or disgorgement as business expenses of being a financial analyst.

Next we consider whether petitioner is entitled to deduct the disgorgement payment or the legal fees in connection with the separate trade or business of selling insider information.  To be a trade or business, a taxpayer's activity must be frequent, regular, and continuous.  Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Juda v. Commissioner, 90 T.C. 1263, 1287 (1988), affd. 877 F.2d 1075 (1st Cir. 1989).  Activities that are sporadic do not qualify as a trade or business.  See Polakis v. Commissioner, 91 T.C. 660, 670-672 (1988).  Whether petitioner was engaged in a trade or business is a question of fact. Higgins v. Commissioner, 312 U.S. 212, 217 (1941).

It has not been established on this record that petitioner's sales of insider information were continuous and occurred regularly.  He obtained insider information and sold it to others until his activities were discovered by the SEC.  However, his internship with Morgan Stanley was intended for a limited period, after which petitioner intended to finish his college education. The civil complaint filed by the SEC contained accusations that petitioner sold insider information involving at least 25 companies resulting in $19 million in profits in connection with Mr. Lee's trading securities.  The criminal charges against petitioner identified five companies about which petitioner sold insider information to Mr. Lee and Mr. Cronin.  The criminal information also contained allegations that petitioner had sold

insider information with respect to at least 19 companies. The five instances of selling insider information to Mr. Lee and Mr. Cronin as set forth in the criminal charges were separate and occurred over several months. With respect to the other instances alleged in the civil and criminal documents, there is insufficient detail to determine that petitioner's activity was "frequent, regular, and continuous".

On the basis of this record, we conclude and hold that petitioner's sale of insider trading information was sporadic and represented a limited opportunistic transactional relationship with Mr. Lee. Accordingly, petitioner was not in a trade or business in connection with his insider trading activities.

Petitioner contends that the legal expenses paid for his defense in civil and/or criminal litigation that arose in connection with his sale of insider information are deductible under section 162. Respondent, however, argues that petitioner is not entitled to a deduction because the legal expenses were paid by his father. Petitioner maintains that his father lent him money to pay his legal expenses and argues that he intended to repay his father as evidenced by promissory notes. Alternatively, petitioner argues that he is entitled to deduct the legal fees because his father paid his legal expenses as a gift to petitioner. Because we have decided that petitioner was not engaged in a trade or business in connection with his sales

of insider information, it is unnecessary to decide whether he paid the legal expenses. That is so because respondent has already allowed the deduction of the disgorgement under section 165(c)(2) consuming all of the income reportable for 1988. Petitioner's ability to deduct any portion of the 1988 or 1989 legal payments is governed by the section 172 net operating loss provisions.

A taxpayer engaged in a trade or business may be entitled to carry a resulting NOL deduction to other taxable years. An NOL is the excess of deductions over the taxpayer's gross income, subject to certain modifications specified in section 172(d)(4). Sec. 172(c). Nonbusiness expenses and losses are not included in NOL's and may not be carried back. Sec. 172(d)(4); Todd v. Commissioner, 77 T.C. 246, 248 (1981), affd. per curiam 682 F.2d 207 (9th Cir. 1982). The section 165(c)(2) loss (not from a trade or business)[6] of the disgorgement would not create an NOL for petitioner's 1988 or 1989 tax year that could be carried back to prior years, including 1987. Sec. 172(d)(4). Likewise, because petitioner is not in a trade or business in connection

---

[6] The disgorgement of petitioner's profits is governed by sec. 165(c)(2). The distinction between losses and expenses is found primarily in the nature and occasion of the expenditure. It is well settled that deductions for cash forfeitures and confiscations, if allowed at all, are normally allowed as loss deductions under sec. 165. Holt v. Commissioner, 69 T.C. 75, 78 (1977), affd. per curiam 611 F.2d 1160 (5th Cir. 1980).

with his sales of insider information, an NOL would not result from the payment of the legal expenses incurred in 1988 or 1989.

We hold that petitioner is not entitled to carry back an NOL deduction from 1988 or 1989 to the year in controversy in this case (1987).

Does Section 1341 Apply to Petitioner's Disgorgement Payment?

Having decided that petitioner is not entitled to an NOL carryback to 1987, we consider his alternative argument that section 1341 applies to the 1988 disgorgement payment. In particular, petitioner argues that he is entitled to a tax credit under section 1341(a)(5) equal to the 1987 tax attributable to the inclusion of the $125,000 disgorgement in his 1987 income. Section 1341 permits a special computation method for the tax liability of a taxpayer who has: (1) Received income (in excess of $3,000) in 1 year under a claim of right; (2) included the amount in income; and (3) in a subsequent taxable year, was required to make restoration of the income to another because it was established that the taxpayer did not have an unrestricted right to the income. Sec. 1341; sec. 1.1341-1(a)(1), Income Tax Regs.

Section 1.1341-1(a)(2), Income Tax Regs., continues with the definition:

> "income included under a claim of right" means an item
> included in gross income because it appeared from all
> the facts available in the year of inclusion that the
> taxpayer had an unrestricted right to such item, and

"restoration to another" means a restoration resulting because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item (or portion thereof).

Section 1341 is titled "CLAIM OF RIGHT", but the statutory language used to describe that concept is that the income item must have been includable because it "appeared" that the taxpayer had an "unrestricted right" to it. (Emphasis added.) The above-quoted regulations, however, again use the term "claim of right" in the process of defining the operative terms of section 1341. The concept of claim of right, accordingly, must be part of our consideration of section 1341 issues.

Respondent contends that petitioner is not entitled to use section 1341 because: (1) Petitioner never included the proceeds of the illegal sale of insider information in his gross income for 1987; (2) petitioner did not have an unrestricted right to the income; i.e., in cases usually involving embezzlement, courts have held that the illegal income is not held under a claim of right; and (3) in general, illegally obtained income does not, per se, give rise to a claim of right. Petitioner disagrees with respondent's contentions and argues that Barrett v. Commissioner, 96 T.C. 713 (1991), a case involving a securities trader who was allowed section 1341 relief, is substantially similar factually and should be followed.

Section 1341 was enacted in 1954 to address the type of situation that existed in <u>United States v. Lewis</u>, 340 U.S. 590 (1951). In that case, the taxpayer repaid, in a later year, part of a bonus received erroneously in a prior year that was closed for tax purposes. Because of those circumstances, the taxpayer lost the benefits of being able to calculate the reduction of income in the year of receipt of the bonus. Those benefits included interest from a refund of the tax paid earlier and differing tax rates between the years of receipt and repayment. Although section 1341 does not address the question of interest, it does address other possible benefits that might have been available from the deduction or computation of the tax in the earlier year.

Respondent contends that section 1341 generally does not apply to circumstances where the income is obtained through illegal means. The cases that have addressed this issue, however, generally involve embezzlement or a similar circumstance where the taxpayer was entrusted with another's cash or assets.[7] We could find only one section 1341 illegal income case that did not involve embezzlement or similar circumstances. On the basis

---

[7] One case involved the misappropriation of a lawyer's clients' trust funds, which in all material respects is the same as embezzlement, especially with respect to the question of whether a taxpayer has a claim of right (appearance of an unrestricted right) with respect to the item in question. See <u>O'Hagan v. Commissioner</u>, T.C. Memo. 1995-409.

of the embezzlement cases, the court, in that case, decided, that the result in the embezzlement case(s) "cannot be limited only to embezzlers; instead, the statute's 'unrestricted right' language must be read to exclude from its coverage all those who receive earnings knowing themselves to have no legal right thereto." Perez v. United States, 553 F. Supp. 558, 561 (M.D. Fla. 1982).

In a memorandum opinion of this Court, the generalized holding of Perez was relied upon in circumstances where a lawyer converted his client's trust fund to his own use. O'Hagan v. Commissioner, T.C. Memo. 1995-409. Factually, however, it is difficult to distinguish a lawyer's conversion of a client's funds entrusted to him from other forms of embezzlement. In both instances, the taxpayer did not have and knew he did not have a claim of right or appearance of unrestricted right to the funds.

Any analysis of the "claim of right" concept in conjunction with embezzlement cases must focus on a line of cases surrounding James v. United States, 366 U.S. 213 (1961). In James, the Supreme Court reversed its holding in Commissioner v. Wilcox, 327 U.S. 404 (1946), that embezzled funds were not includable in gross income. Wilcox was, in part, predicated on the embezzler's lack of "a claim of right to the alleged gain". 327 U.S. at 408. In James v. United States, supra at 219, the Court reasoned that

> When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received

income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent". * * * [Citation omitted.]

The requirement to report embezzled funds for tax purposes even though the embezzler/taxpayer may not have had a claim of right to the funds was analyzed in Yerkie v. Commissioner, 67 T.C. 388 (1976). In that case, an embezzler failed to meet the first qualification of section 1341; i.e., the embezzler did not have a claim of right to the embezzled funds. Id. at 392. We agree with respondent that with respect to embezzlement gains it is well established that section 1341 is not available. It does not necessarily follow, however, that taxpayers with illegal income, per se, are not entitled to use section 1341. With respect to each taxpayer it would be necessary to decide whether his circumstances meet the requirements of section 1341. Embezzlers do not meet the claim of right requirement of section 1341 because there was no claim of right, not because the income or gain was illegally obtained. Section 1341 applies only if the taxpayer appeared to have an unrestricted right to the income in the year of receipt. Sec. 1341(a)(1); sec. 1.1341-1(a)(1), Income Tax Regs.

Here, petitioner's and Mr. Lee's activities were illegal in every respect. Petitioner's act of obtaining the insider information, his sale of insider information to others, and the

use of the information by others were all illegal acts. Although Mr. Lee did not place any restrictions on use of the funds paid to petitioner, under securities laws petitioner did not have a claim of right or the appearance of an unrestricted right to the money. He had then knowingly committed a crime, and he was subject to criminal penalties and to the SEC's remedy of disgorgement.[8] In 1988, petitioner's disgorged profits were placed in a receivership fund to be used as restitution for investors who could show a loss due to petitioner's and/or Mr. Lee's illegal actions. Under these circumstances, we hold that petitioner does not pass the section 1341(a)(1) requirement and that he is not entitled to section 1341 relief.

Petitioner argued that his circumstances were similar to those of Barrett v. Commissioner, 96 T.C. 713 (1991). In that case the taxpayer, a shareholder in a stock brokerage, purchased stock options on the basis of insider information and realized gain from the sale of the options. Although the taxpayer was not criminally prosecuted, he was sued by the option brokers with whom he had made the trades and profit due to insider information. In a year subsequent to the option transactions,

---

[8] Disgorgement is used as a deterrent and is intended to make the improper use of security information unprofitable. Hateley v. SEC, 8 F.3d 653, 655 (9th Cir. 1993); SEC v. Rind, 991 F.2d 1486, 1490 (9th Cir. 1993); SEC v. Wang, 944 F.2d 80, 85 (2d Cir. 1991). The amount disgorged must be reasonable; i.e., approximately equal to the violator's profits. Hateley v. SEC, supra at 656.

the taxpayer settled the civil suit by disgorging to the option brokers part of his profit from the sale of the options. In Barrett, the taxpayer was allowed to use section 1341 after the Court found "that the taxpayer did not have an unrestricted right" to the profits, or in other words, "that the taxpayer had a legal obligation to restore the item." Id. at 718-719.

Although Barrett is factually similar to the case under consideration, the holding in that case concerned section 1341(a)(2). The Court in Barrett, however, did not consider whether there was a claim of right or the appearance of unrestricted right to income from option purchases. The focus in Barrett was whether the repayment was due to a restriction on the taxpayer; i.e., whether the taxpayer had an obligation to pay the option brokers who had sued him. Because of our holding that petitioner did not meet the first prong of the section 1341 requirements, we need not consider whether petitioner met the other requirements of section 1341.

Accordingly, petitioner does not qualify for section 1341 treatment with respect to the disgorgement payment.

Additions to Tax for Fraud Under Section 6653

The next issue for our consideration is whether petitioner is liable for additions to tax for fraud under section 6653(b)(1)(A) and (B) or, in the alternative, for negligence

under section 6653(a)(1)(A) and (B).[9]  Section 6653(b)(1)(A) imposes an addition to tax equal to 75 percent of the underpayment attributable to fraud.  Additionally, section 6653(b)(1)(B) imposes an addition to tax equal to 50 percent of the interest due on an underpayment attributable to fraud. Respondent has the burden of proving fraud by clear and convincing evidence.  Rule 142(b).  To satisfy this burden, respondent must prove that petitioner intended to evade taxes by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  Parks v. Commissioner, 94 T.C. 654, 661 (1990); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

---

[9] Respondent determined additions to tax for 1987 under sec. 6653(b)(1)(A) and (B), the version of sec. 6653(b) that applied to petitioner's 1987 return.  See Tax Reform Act of 1986 (TRA), Pub. L. 99-514, sec. 1503(a), 100 Stat. 2085, 2742.  In the answer, respondent incorrectly alleged that the fraud additions for 1987 should have been asserted under sec. 6653(b)(1) and (2), a prior version of sec. 6653(b).  Similarly, in the answer, respondent asserted alternate additions to tax for negligence for 1987 under sec. 6653(a)(1) and (2), a prior version of sec. 6653(a).  The version of sec. 6653(a) applicable to taxable year 1987 is sec. 6653(a)(1)(A) and (B).  TRA sec. 1503(a).

With respect to the fraud additions to tax, the deficiency notice cited the version of sec. 6653(b) applicable to the year in issue and properly informed petitioner of respondent's determination.  Respondent's assertion in the answer of a prior version of sec. 6653(a) and (b) for the additions is an error in form only and does not have a substantive effect on this case. In any event, citation of a prior version of sec. 6653(a) and (b) is immaterial to the outcome of the case because respondent bears the burden on both the fraud and negligence additions to tax. See Rule 142.

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Estate of Pittard v. Commissioner, 69 T.C. 391 (1977). Fraud is never presumed and must be established by affirmative evidence of fraudulent intent. Edelson v. Commissioner, 829 F.2d 828, 833 (9th Cir. 1987), affg. T.C. Memo. 1986-223; Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may be proven by circumstantial evidence because direct proof of the taxpayer's intent is seldom available. Spies v. United States, 317 U.S. 492 (1943); Rowlee v. Commissioner, supra. Courts have developed a nonexclusive list of factors that establish fraudulent intent: (1) Understatement of income; (2) inadequate records; (3) implausible or inconsistent explanations of behavior; (4) concealment of assets; (5) failure to file tax returns; (6) filing false documents; (7) failure to cooperate with tax authorities; (8) dealing in cash; and (9) engaging in illegal activity. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Miller v. Commissioner, 94 T.C. 316, 334 (1990); Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). A taxpayer's intelligence, education, and experience are relevant in determining fraudulent intent. Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).

From the record in this case, we hold that petitioner's 1987 return was fraudulent. He pled guilty to securities, mail, and wire fraud in connection with his acquisition and sale of insider information. He failed to report any of the income he received from the sales in either 1987 or 1988. Reporting the illegal income would have increased the risk that petitioner's illegal activities would be detected. Reluctance to report illegal income because of the chances that the illegal source of the income will be discovered does not preclude a tax evasion motive. Recklitis v. Commissioner, supra at 909. Moreover, participation in illegal activities is a badge of fraud. Bradford v. Commissioner, supra. In addition, petitioner attempted to conceal his illegal activities and income by dealing in cash and using a bank account under fictitious names. He did not maintain any records of the illegal income or how he used the money received from selling insider information.

Petitioner argues that he did not have fraudulent intent because he did not consider whether or not to report the illegal income. Petitioner's argument is unpersuasive. He is a well-educated and knowledgeable taxpayer. In college, he took a number of business courses, including a class on Federal income tax accounting. Petitioner does not deny that he knew that illegal income was taxable and was aware of his reporting obligations. In addition, petitioner understood that he received

cash; he did not use his own name on the bank account to avoid detection of his illegal activity and income.  We are satisfied that respondent has proven by clear and convincing evidence that petitioner had a fraudulent intent.  Petitioner is liable for the additions to tax for fraud under section 6653(b)(1)(A) and (B).  Consequently, we do not need to consider respondent's alternate assertion that petitioner is liable for additions to tax for negligence.

Addition to Tax Under Section 6661

The final issue for our consideration is whether petitioner is liable for a section 6661 addition to tax.  Section 6661(a) imposes an addition to tax of 25 percent of any underpayment attributable to a substantial understatement of tax.  An understatement is the excess of the correct tax over the tax reported on the return.  Sec. 6661(b)(2)(A).  An understatement is substantial if it exceeds the greater of 10 percent of the correct tax or $5,000.  Sec. 6661(b)(1)(A).  The understatement can be eliminated if substantial authority existed for the taxpayer's treatment of the item in dispute or if the taxpayer adequately disclosed relevant facts regarding treatment of the item on the return.  Sec. 6661(b)(2)(B); sec. 1.6661-4(a), Income Tax Regs.  Petitioner has the burden to show that he is not liable for the section 6661 addition to tax.  Rule 142(a).  Petitioner has not made any arguments or presented any evidence

regarding the section 6661 addition to tax.  Accordingly, we find that petitioner is liable for an addition to tax under section 6661 for 1987.  See <u>Cluck v. Commissioner</u>, 105 T.C. 324, 340 (1995).

<u>Decision will be entered under</u>

<u>Rule 155.</u>